**UNITED STATES of America, Appellee,**

v.

**Mario BIAGGI, Stanley Simon, Richard Biaggi, Peter Neglia, John Mariotta, and Bernard Ehrlich, Defendants–Appellants.**

Nos. 35, 24, 25, 26, 27, 23, Dockets 88–1530, –1531, –1532, –1533, –1543, 89–1015.

United States Court of Appeals, Second Circuit.

Argued Aug. 28, 1989.

Decided June 29, 1990.

James M. LaRossa, New York City (Karen F. Silverman, Arie Bucheister, LaRossa, Mitchell & Ross, New York City, on the brief), for defendant-appellant Mario Biaggi.

Charles Haydon, New York City (Paul A. Victor, Dublirer, Haydon, Straci & Victor, New York City, on the brief), for defendant-appellant Simon.

Dominic F. Amorosa, New York City, for defendant-appellant Richard Biaggi.

Alan R. Kaufman, New York City (Buchwald & Kaufman, New York City, on the brief), for defendant-appellant Neglia.

Jeffrey Glekel, New York City (Albert J. Boro, Jr., Skadden Arps Slate Meagher & Flom, New York City, on the brief), for defendant-appellant Mariotta.

Peter J. Driscoll, New York City (Catherine L. Redlich, Kostelanetz Ritholz Tigue & Fink, New York City, on the brief), for defendant-appellant Ehrlich.

Edward J.M. Little, Asst. U.S. Atty., New York City (Benito Romano, U.S. Atty., Michele Hirshman, Vincent L. Briccetti, Celia Goldway Barenholtz, Asst. U.S. Attys., Mary Shannon Little, Sp. Asst. U.S. Atty., Donna Merris, Law Clerk, New York City, on the brief), for appellee.

Before FEINBERG and NEWMAN, Circuit Judges, and MISHLER, Senior District Judge.[*]

JON O. NEWMAN, Circuit Judge:

This is an appeal by six defendants, including a former United States Congressman, from convictions arising out of the affairs of the Wedtech Corporation, a manufacturing company located in New York City that received contracts from the Defense Department. The defendants are former Congressman Mario Biaggi; his son, Richard Biaggi; the Congressman's former law partner, Bernard Ehrlich; the former Bronx Borough President, Stanley Simon; the former chief executive officer of Wedtech, John Mariotta; and the former New York regional administrator of the Small Business Administration, Peter Neglia. The six defendants appeal from judgments of conviction entered November 18, 1988,[1] in the Southern District of New York (Constance Baker Motley, Judge) after a five-month jury trial.

The appeal presents a host of issues. It also requires some consideration of the distinction between bribes and extortion payments, on the one hand, and political contributions and legal fees, on the other hand. The distinction is clear in theory, but this case demonstrates how blurred the line can become in practice when a company that

---

[*] The Honorable Jacob Mishler of the District Court for the Eastern District of New York, sitting by designation.

[1.] Ehrlich's judgment was entered January 10, 1989.

requires political assistance and legal services in dealing with governmental bureaucracies makes payments to office holders and lawyers associated with them. Though the distinction is implicated in this case, we are satisfied that the risk of mischaracterizing lawful political contributions and legal fees as bribes and extortion payments did not reach the point where rights of the defendants were denied. Other considerations, however, lead us to reverse convictions of some defendants on some counts. We affirm the convictions of all defendants on at least two counts.

## BACKGROUND

To promote understanding of the many issues in this complex case we set forth first the undisputed facts of Wedtech's history and then the Government and the defense contentions concerning the different activities that form the basis for the criminal charges.

*Undisputed Facts.* Wedtech began its existence as Welbilt Electronic Tool & Die Corporation ("Welbilt"), a small sheet metal fabricating company located in the South Bronx. Welbilt changed its name to Wedtech in 1983 when it made a public offering of its stock. For convenience, we will refer to the company at all times as "Wedtech." Defendant John Mariotta founded the company and remained chairman until company officials ousted him in 1986. In 1975 Wedtech was accepted into the Small Business Administration's "Section 8(a)" program, under which minority-owned businesses are eligible for government contracts without competitive bidding. *See* 15 U.S.C. § 637(a) (1988). Mariotta is of Puerto Rican descent.

In 1978 defendant Mario Biaggi, then a Congressman from the Bronx, met Mariotta and Fred Neuberger, a co-owner of Wedtech. In addition to serving in Congress, Biaggi was at that time a partner in a small law firm, known as Biaggi & Ehrlich. His law partner was defendant Bernard Ehrlich. Wedtech retained Biaggi & Ehr-

lich, initially at an annual retainer of $20,000. The retainer was subsequently increased in stages to $150,000. Biaggi withdrew as a member of the law firm in 1979, after the House of Representatives adopted Rule XLVII, which limited outside income of members of the House to 30 percent of their salaries.[2] The law firm bought his partnership interest for $320,000 to be paid over a ten-year period. Biaggi remained in an "of counsel" relationship to the firm. Biaggi's son, defendant Richard Biaggi, became a partner in the firm in 1983.

Starting in 1978, Biaggi (all references are to the father, unless otherwise indicated) contacted various governmental officials on behalf of Wedtech, urging awards of contracts from the Defense Department through the SBA's section 8(a) program and loans from the Economic Development Administration. In addition to Biaggi, Wedtech also benefitted from the services of attorney E. Robert Wallach, former White House assistant Lyn Nofziger, and other Washington lobbyists. Wallach frequently contacted then White House Chief of Staff Edwin Meese on Wedtech's behalf.

Among the benefits achieved for Wedtech by its lobbyists and lawyers were the awards of a $27 million contract in 1982 to make small engines for the Army and a $24 million contract in 1984 to make pontoons (raft-like structures carried on ships to aid in unloading) for the Navy. Despite these contract awards, Wedtech experienced serious financial difficulties and ultimately filed for bankruptcy at the end of 1986.

*Contentions Concerning Criminality.* The Government's evidence against the defendants came primarily from four Wedtech officials, Fred Neuberger, Mario Moreno, Lawrence Shorten, and Anthony Guariglia. These four cooperating witnesses had been charged with a series of federal and state violations arising out of their activities at Wedtech and had pled guilty pursuant to plea agreements. All four testified under grants of use immunity. Their testimony concerned six basic matters:

**2.** Rule XLVII was adopted after enactment of the Ethics in Government Act of 1978, Pub.L. 95–521, 92 Stat. 1824 (1978), *codified at* 5 U.S.C. app. § 210 (1988), which limited outside income of Executive Branch officials.

1. *The Five Percent Stock Interest.*
When Wedtech went public, the company
issued two and one-half percent of its stock
to Ehrlich and an equal percent to Richard
Biaggi. The Government contended that
Richard was given his share as a nominee
for his father, that the total five percent
stock interest was paid as a bribe to influ-
ence Congressman Biaggi to use the pow-
ers of his office to secure government con-
tracts for Wedtech, and that the payment
was made in response to an extortionate
demand by the Congressman, aided by Ehr-
lich. A restriction precluded sale of the
shares for two years, a circumstance that
made it difficult to ascertain their value
when issued. The law firm's accountant
placed the value, when issued, at $35,000
for each recipient. After the restriction
was lifted, Ehrlich and Richard Biaggi sold
about one-third of their shares, each realiz-
ing more than $600,000.

The defendants contended that the five
percent stock interest was transferred to
the partners of the law firm, Ehrlich and
Richard Biaggi, in fulfillment of a previous
promise to reward the firm for its loyalty
to Wedtech in the early days when the firm
billed modestly for legal services, declined
to insist on prompt payment, and did not
bill at all for some services. Defendants
also contended that Richard Biaggi was
issued the stock for himself as a partner in
the law firm, and not as a nominee for his
father.

2. *The $50,000 Loop Drive Payment.*
After Wedtech obtained the pontoon con-
tract from the Navy, it needed a waterside
property at which to test the vessels and
identified a site known as One Loop Drive,
located in the Bronx. The property was
owned by New York City. To secure the
City's willingness to lease the property,
Ehrlich sought the assistance of defendant
Stanley Simon, who was then the Bronx
Borough President and a member of the
Board of Estimate, which approved City
leases. Simon arranged for Wedtech offi-
cials to meet with Susan Frank, the City's
Commissioner of Ports and Terminals.
Over the course of a few days in June 1984,
a three-year lease was negotiated whereby
the City agreed to rent the Loop Drive

property to Wedtech for $50,000 a year,
well below the annual rent of $125,000 the
City had initially requested. Ehrlich nego-
tiated the lease terms on behalf of Wed-
tech. Ehrlich and his firm also negotiated
with a corporation that occupied the build-
ing at One Loop Drive to assure Wedtech's
use of the site's parking lot in connection
with waterside activities required to fulfill
the pontoon contract.

The lease required approval of the Board
of Estimate. Wedtech needed prompt ap-
proval in order to satisfy the Navy that it
had the waterside site needed to perform
the contract. To secure approval at the
Board's June 13 meeting required unani-
mous consent, since the matter had arisen
too quickly to be placed on the agenda for
that meeting. Two Board members object-
ed, and, consequently, the item was de-
ferred until July. Biaggi called Simon and
demanded his assistance in having the
lease approved at a subsequent meeting.
According to Moreno, Ehrlich reported that
Biaggi had "punished" Simon, warning him
"that his next election depended on Mario
Biaggi's support and that he had to start
moving really quick." The Board approved
the lease at its July 12 meeting.

Ehrlich informed Moreno that the law
firm would bill Wedtech $50,000 for work
performed in connection with the Loop
Drive property. At that time the firm's
annual retainer was $150,000. Ehrlich said
that the transaction required considerable
extra work. He referred both to strictly
lawyering activities and to political efforts
the firm undertook to secure Board of Esti-
mate approval. The firm billed Wedtech
$50,000 for "Ports and terminal matter.
Services rendered June 1984," and the bill
was paid on July 13. Thereafter, Moreno
paid a young associate at the firm, Carlos
Cuevas, Jr., $5,000 as a bonus for his work
on the Loop Drive transaction.

The Government contended that the $50,-
000 payment to the law firm was a bribe to
Biaggi to induce him to use his official
position to secure City and Board of Esti-
mate approvals for the Loop Drive lease
and that the payment was made in re-

sponse to extortionate demands by Biaggi, aided and abetted by Ehrlich.

The defendants contended that the $50,000 was a fee for legal services rendered in connection with leasing the Loop Drive property.

3. *Benefits to Simon.* The Government contended that Stanley Simon also made an extortionate demand upon Wedtech for $50,000, which the Government alleged was in connection with the Loop Drive lease. Neuberger testified that in June 1984 he attended a benefit for the Riverdale (New York) Hebrew Home for the Aged held at the Yonkers racetrack. At that function, according to Neuberger, Simon said to him that "he [Simon] is running a re-election campaign that is a very hard fought campaign and he needs help." When Neuberger asked, "[W]hat kind of help do you expect?", Simon replied $75,000 or $100,000. Neuberger thought these figures were ridiculous and observed that it was illegal for a corporation "to make a contribution to a campaign." Simon then said, "[W]ell, do it in the form of donations to synagogues, churches and some other expenses." Neuberger said the best he could do was $50,000 and "we settled for that."

Neuberger also testified that at the same function, he asked Susan Frank how things looked for the Loop Drive lease and was told that "you are in good shape." At that point, Neuberger testified, Simon pulled him aside and cautioned him not to talk with Frank.

Neuberger testified that the following Monday he gave instructions to a Wedtech employee, Ceil Lewis, to release a total of $50,000 for purposes that Simon would later indicate to her and to disburse the funds from a Wedtech account known as the FHJ account. The Government contended that the FHJ account was used to pay most of the $50,000 that Neuberger had promised Simon. According to the Government, the major expenditures were $20,000 in charitable contributions to two synagogues, $10,000 as a political contribution to "Friends of Simon," and $10,000 in cash. Lewis testified that she gave the

cash in a sealed envelope to Simon's assistant, Ralph Lawrence; he testified that he received an envelope from Lewis and gave it to Simon, unopened.

Simon acknowledged that Wedtech benefitted his reelection campaign but disputed the timing, purpose, and completion of the $50,000 of payments. He presented evidence from those handling arrangements for the Riverdale Hebrew Home to show (a) that the *June* 1984 fund-raising event at the Yonkers Raceway was arranged by the Men's Club of the Home and that the guest list, which included about 80 people, did not include the names of Stanley Simon or Fred Neuberger, and (b) that the Bronx Division of the Hebrew Home ran a fund-raising event at the Yonkers Raceway in *November* 1984 and that the guest list for this event showed Stanley Simon, Fred Neuberger, and Susan Frank in attendance.

Simon contended that the discussion concerning a political contribution occurred in January 1985 at his home on an occasion when he was receiving visitors mourning the death of his father. At that time, he testified, Neuberger volunteered that "people at the company" were going to contribute $50,000 to his 1985 reelection campaign for borough president. Simon testified that Neuberger later contributed $10,000 and Mariotta $5,000. He denied receiving other political contributions from Wedtech officials and denied receiving a cash payment delivered by Lawrence or anyone else.

Thus, Simon's version was that the June 1984 race-track meeting between him and Neuberger never occurred, that such a meeting did occur at a similar fund-raising event in November 1984, months after the Board of Estimate had approved the Loop Drive lease, that the political contribution was not discussed until January 1985, that only $15,000 of contributions were received, and that any payments received were legitimate political contributions.

In addition to the $50,000 of payments allegedly made in response to an extortionate demand in connection with the Loop Drive lease, the Government contended that Simon received three other unlawful

benefits, one of which was paid by Wedtech. Moreno testified that in 1981 Ehrlich introduced him to Simon, whom Ehrlich described as an important person to be "cultivated." Later Ehrlich told Moreno that Simon wanted Wedtech to hire Simon's brother-in-law, Henry Bittman. Wedtech complied, hiring Bittman as a payroll clerk at $20,000 a year and subsequently raising his salary to $35,000. Wedtech employees testified that Bittman's work was unsatisfactory but that he was kept on the payroll in fulfillment of a promise to Simon.

Simon did not dispute that Wedtech hired Bittman and gave him raises but denied that he had ever asked anyone at Wedtech to do so.

The two other alleged benefits were not paid by Wedtech. First, the Government contended that Simon hired Ralph Lawrence as his assistant when he was the Bronx Borough President and, when Lawrence's salary rose to $36,000, demanded that Lawrence kick back to him one half of all subsequent salary increases. Lawrence testified that, as his salary rose to $52,000, he shared half of his salary increases with Simon, providing the kickbacks in cash and purchases of goods and services for Simon's benefit, a significant portion of which was meals. The value of the kickbacks was approximately $14,000 over three and one-half years.

Simon acknowledged hiring Lawrence but denied demanding or receiving any portion of his salary. He also denied receiving cash from Lawrence. He acknowledged occasions when Lawrence paid a meal check for him, but maintained that the two ate together hundreds of times a year (as Lawrence had testified) and that sometimes Simon paid and sometimes Lawrence paid. Simon accused Lawrence of lying about the extortion arrangement, contending that Lawrence had made up the claim during a late-night questioning by the Bronx District Attorney's office. Lawrence conceded that he was frightened during the questioning and made his accusations around 2 a.m.

The second non-Wedtech illegality charged to Simon concerned Sabino Fogliano, a Bronx contractor. The Government contended that Simon arranged introductions for Fogliano with various New York City officials and that in return Fogliano provided benefits to Simon. The only benefit alleged in the charges against Simon was $9,000 worth of marble and tile work done by Fogliano at Simon's home. Fogliano testified that he did the work at Simon's request and did not send a bill because he knew he would not be paid.

Simon acknowledged that Fogliano had supplied labor and materials worth $9,000 for work at his home, but he testified that the tile work was part of an overall home renovation job estimated to cost more than $22,000, that the job was never finished, and that he did not pay Fogliano both because he was not billed and because the work was not completed. Simon also contended that Fogliano did not send a bill once he learned that Simon was under federal investigation because Fogliano wanted to avoid any dealings that might direct federal investigators in his direction. Fogliano testified against Simon under a grant of use immunity from the federal government, and admitted on cross-examination that he had evaded federal income taxes on $800,000 of income. After trial, however, Fogliano pled guilty to New York state charges of evading taxes on $8,500,000. Simon unsuccessfully sought a new trial on the ground that Fogliano had lied to minimize the extent of his tax evasions, thereby precluding an effective attack on his credibility and his motive for accusing Simon.

4. *The Section 8(a) Fraud.* The Government contended that Wedtech's application for admission to the section 8(a) program and its subsequent retention in the program by the SBA were fraudulent. A company qualifies for the section 8(a) program if it is at least 51 percent owned by "one or more socially and economically disadvantaged individuals," 15 U.S.C. § 637(a)(4)(A)(i)(I), a phrase that includes members of groups subjected to racial or ethnic prejudice, *id.* § 637(a)(5); *see* 13 C.F.R. § 124.105(b) (1990) (Hispanic Americans). Mariotta is of Puerto Rican descent. When Neuberger became Mariotta's partner, they created false documents to make

it appear that Mariotta owned 66⅔ percent of Wedtech's stock, whereas each in fact owned 50 percent.

After Wedtech went public, the dilution of Mariotta's interest prompted Mariotta and other Wedtech officials to devise fraudulent arrangements to make it appear that Mariotta retained an ownership interest above 50 percent. The device was a series of "stock purchase agreements" whereby insiders who had received stock purported to assign their interests to Mariotta, who was obligated to pay for the shares over a ten-year period, with no payments due for the first two years; upon Mariotta's failure to pay, the shares would revert to the insiders. Mariotta verbally agreed with the insiders that he would not make the payments, thereby assuring that the insiders would retain their interests.

The defendants contended that Mariotta owned two-thirds of Wedtech's stock when the first section 8(a) application was made and that the stock purchase agreements whereby he retained record ownership of a majority of Wedtech shares, after the public offering, were bona fide.

5. *The Slush Fund.* The Government contended that Mariotta and Neuberger established a bank account, known as "FHJ Associates," which they used to divert to themselves cash that belonged to Wedtech. The account was funded with money earned on goods manufactured by Wedtech but billed on FHJ invoices. Subsequently, other Wedtech officials, including Moreno, Shorten, and Guariglia, participated in the FHJ account. By the time he left Wedtech, Mariotta had received more than $1 million in cash from the FHJ account. The Government made no claim that any defendant other than Mariotta benefitted from the FHJ account.

Mariotta contended that funds he received from the FHJ account were repayments of loans that he had made to Neuberger.

6. *The Neglia Bribe.* The Government contended that Wedtech officials obtained the cooperation of defendant Peter Neglia, the New York regional administrator of the SBA and later the chief of staff to the SBA Administrator in Washington, by bribing him with a promise of future employment. According to Moreno's testimony, Ehrlich and Moreno promised Neglia that after he left government employment he would have a job at the law firm of Biaggi & Ehrlich at a salary of $100,000 and that half of his salary would be paid by Wedtech.[3] The Government contended that this promise was made for Neglia's past help and in the expectation of his future assistance. Neglia had assisted Wedtech in remaining in the section 8(a) program after the public offering had diminished Mariotta's holding below the 50 percent mark, rendering Wedtech ineligible for continued participation. The Government contended that Neglia was aware of the sham nature of the Mariotta stock purchase agreements and of Wedtech's ineligibility for continued participation in the section 8(a) program. After the promise of future employment, Neglia alerted Wedtech to efforts brewing in the SBA and in Congress to decertify Wedtech and acted to keep Wedtech in the section 8(a) program.

Neglia denied acting improperly on Wedtech's behalf and denied being promised any employment with Biaggi & Ehrlich. He acknowledged that after he left the SBA in early 1986, he opened his own law office and did legal work for Biaggi & Ehrlich in an "of counsel" capacity to the firm. In 1986 the firm paid him $42,000.

These six episodes resulted in convictions of the appellants on the following charges:

1. The Five Percent Stock Interest:

extortion, 18 U.S.C. § 1951 (1988): Biaggi, Ehrlich

bribery, 18 U.S.C. § 201(b) (1988): Biaggi, Ehrlich, Mariotta, Richard Biaggi

gratuity, 18 U.S.C. § 201(c) (1988): Biaggi, Ehrlich, Mariotta, Richard Biaggi

---

3. The Government also alleged, in separate counts and corresponding RICO predicate acts, that Neglia was bribed with $4,500 in contributions to Republican political organizations on

behalf of Neglia and his designee, and a promise of an option to purchase 20,000 shares of Wedtech stock. The jury found these acts not proven.

mail fraud, 18 U.S.C. § 1341 (1988): Biaggi, Ehrlich, Richard Biaggi

false financial disclosure, 18 U.S.C. § 1001 (1988): Biaggi

false tax return, 26 U.S.C. § 7206(1) (1988): Biaggi, Richard Biaggi

2. The $50,000 Loop Drive Payment:

extortion: Biaggi, Ehrlich

bribery: Biaggi, Ehrlich, Mariotta

mail fraud: Biaggi, Ehrlich

3. Benefits to Simon:

$50,000 payment:

extortion: Simon

grand jury perjury, 18 U.S.C. § 1623 (1988): Simon

tax evasion, 26 U.S.C. § 7201 (1988): Simon

Job for Bittman:

extortion: Simon

grand jury perjury: Simon

Lawrence kickbacks:

extortion: Simon

tax evasion: Simon

grand jury perjury: Simon

Fogliano tile work:

tax evasion: Simon

grand jury perjury: Simon

4. The Section 8(a) Fraud:

mail fraud: Biaggi, Ehrlich, Mariotta

5. The Slush Fund:

tax evasion: Mariotta

6. The Neglia Bribe:

bribery: Ehrlich, Neglia

gratuity: Ehrlich, Neglia

obstructing justice, 18 U.S.C. § 1503 (1988): Neglia

Most of these substantive offenses were also charged as racketeering acts for purposes of RICO substantive and conspiracy offenses, 18 U.S.C. § 1962(c), (d) (1988). The jury found that Biaggi, Ehrlich, and Mariotta committed two or more RICO predicate acts and convicted these three defendants of RICO substantive and conspiracy offenses. In addition, Biaggi was convicted of grand jury perjury for falsely denying that he contacted the Government on behalf of Wedtech.

The following aggregate sentences were imposed:

| | Prison Term | Fine |
|---|---|---|
| Biaggi | eight years | $242,000 |
| Ehrlich | six years | $222,000 |
| Simon | five years | $ 70,000 |
| Mariotta | eight years | $291,000 |
| Richard Biaggi | two years | $ 71,000 |
| Neglia | three years | $ 30,000 |

In addition, judgments of forfeiture were entered for the following amounts: Biaggi, $350,000; Ehrlich, $350,000; Simon, $25,000; Mariotta, $11,700,000.

## DISCUSSION

### I. Joinder

Misjoinder claims are advanced by several defendants. The major challenge is brought by Simon, who contends that he was entitled to a severance of two counts that charged criminal activity unrelated to Wedtech. Count 21 charged Simon with extorting from Ralph Lawrence, his assistant in the Bronx Borough President's office, one half of Lawrence's salary increases; Count 23 charged tax evasion for the year 1985, based on failure to report the $50,000 in benefits from Wedtech, the salary kickbacks from Lawrence, and the $9,000 of tilework from Sabino Fogliano. Simon contends that since he was tried with other co-defendants, the governing standards are those of Rule 8(b) (joinder of defendants) of the Federal Rules of Criminal Procedure, rather than Rule 8(a) (joinder of offenses), and that joinder of Counts 21 and 23 is not permissible under Rule 8(b).

Judge Motley initially denied Simon's motion for severance, ruling that Rule 8(a) governed and that these counts were of "the same or similar character," Fed.R. Crim.P. 8(a), as other extortion counts in the indictment. *United States v. Biaggi*, 672 F.Supp. 112, 124 (S.D.N.Y.1987). Simon renewed his motion after this Court's decision in *United States v. Turoff*, 853 F.2d 1037, 1043 (2d Cir.1988), which appeared to state that claims for severance of counts in a multi-defendant case are to be governed by the standards of Rule 8(b). In a thoughtful opinion, drawing upon the equally thoughtful opinion of Judge Sand in *United States v. Clemente*, 494 F.Supp. 1310 (S.D.N.Y.1980), *aff'd on other*

*grounds sub nom. Fiumara v. United States,* 727 F.2d 209 (2d Cir.), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984), Judge Motley ruled that *Turoff* should be understood to apply Rule 8(b) standards to the claim of a defendant in a multi-defendant trial only when he seeks severance of counts in which he and at least one of his co-defendants are charged, and that Rule 8(a) standards apply to a defendant in a multi-defendant trial who seeks severance of counts in which he is the only defendant charged. *United States v. Biaggi,* 705 F.Supp. 852 (S.D.N.Y. 1988). However, Judge Motley also ruled that Counts 21 and 23 were properly joined even under the standards of Rule 8(b). *Id.* at 855–56, 862–64.

■ Without resolving the issue of whether *Turoff* should be limited in the manner suggested by Judges Motley and Sand, we agree with the District Court that joinder of Counts 21 and 23 was proper even under Rule 8(b). Though the Lawrence extortion (Count 21) did not involve the same victim as Simon's extortion of Wedtech, the Lawrence extortion was within "the same series of acts or transactions," Fed.R.Crim.P. 8(b), as the extortions charged to Simon's co-defendants. Simon used Lawrence as the means of obtaining many of the benefits he derived from Wedtech, notably the $10,000 cash payment. His demand to receive benefits from Lawrence was inextricably related to his extortion of Wedtech. Proof of one scheme was helpful to a full understanding of the other. *See United States v. Turoff,* 853 F.2d at 1044.

■ Simon's tax evasion for 1985 (Count 23) was also properly joined under Rule 8(b). *Turoff* recognized the propriety of joining tax counts to non-tax counts in multi-defendant cases where the revenue on which the tax was evaded resulted from the criminal conduct charged in the non-tax counts. *See United States v. Roselli,* 432 F.2d 879 (9th Cir.1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971). The core of the tax count was the income extorted from Wedtech and Lawrence. Since a tax count deals with taxes

evaded on a single year's income, it was not error in this case to join the tax count, even though it included a relatively small amount of income from the unrelated transaction involving Fogliano. *See United States v. McGrath,* 558 F.2d 1102, 1106 & n. 6 (2d Cir.1977). That principle, however, has its limits. We would have a very different case if the Government had sought to join several defendants who all extorted benefits from Fogliano and then joined a tax count that charged Simon with evading taxes not only on income from Fogliano but also on income extorted from Wedtech. But where, as here, the Wedtech extortion is central to the trial and income from it forms the core of the tax count, that count need not be severed just because it includes a small amount of unreported income from other sources.

■ We also reject Richard Biaggi's claim that he was unfairly prejudiced by his joinder with defendants charged with the core of the Wedtech illegalities. He contends that he was placed in an untenable position of having to prove his membership in the firm of Biaggi & Ehrlich to justify his receipt of half of the five percent stock interest in Wedtech, thereby subjecting himself to the prejudicial effect of the evidence concerning the firm's activities with which he was not personally involved. However, it is obvious that even in a separate trial much of the evidence concerning the activities of the firm and of Wedtech would have been admissible in evidence to prove the circumstances concerning the five percent stock transaction.

## II. Jury Selection

Appellants make two challenges to the selection of the jury. Mariotta contends that the jury selection process used in the Southern District of New York unlawfully discriminates against Blacks and Hispanics, and he and Biaggi contend that the Government's use of its peremptory challenges discriminated against Hispanics and Italian–Americans.

A. *The Southern District's Jury Plan.* The Southern District's Jury Plan uses voter registration lists as the exclusive source

of names of prospective jurors. After a two-day hearing, Judge Motley found the following facts pertinent to Mariotta's claim that use of voter registration lists resulted in unlawful underrepresentation of Blacks and Hispanics. Based on 1984 figures, the percentage of Blacks in the population of the Southern District was 19.9, and the percentage of Blacks in the Master Jury Wheel for the Manhattan seat of court was 16.3. The comparable percentages for Hispanics were 15.7 and 11.0. The disparity for Blacks, *i.e.*, the underrepresentation, was 3.6 percentage points and for Hispanics, 4.7 percentage points. *See United States v. Biaggi*, 680 F.Supp. 641, 647, 652 (S.D.N.Y.1988).

■ 1. *Equal Protection Claim.* Focusing first on the Fifth Amendment claim, based on the equal protection component of that amendment's Due Process Clause, Judge Motley applied this Court's analysis in *Alston v. Manson*, 791 F.2d 255, 257 (2d Cir.1986), *cert. denied*, 479 U.S. 1084, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987). *Alston* read *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), to establish a three-part test for a *prima facie* case of jury discrimination amounting to a denial of equal protection: (a) a cognizable group (b) that is substantially underrepresented and (c) a selection procedure that is not racially neutral.[4] Agreeing with Mariotta that the first two elements of the test were met, findings the Government does not contest on appeal, the District Judge rejected the equal protection challenge on the ground that use of the voter registration list as the sole source of prospective jurors had not been shown to deprive the Jury Plan of racial neutrality or render it susceptible to abuse.

As Judge Motley pointed out, Mariotta made no claim that Blacks or Hispanics have been hindered in registering to vote. They have simply chosen not to register in the same proportion as Whites. That circumstance is quite different from the Texas "key man" selection system at issue in *Castaneda* or the Connecticut quota system favoring small towns with low minority populations at issue in *Alston*. Mariotta disputes that the unimpaired ability of Blacks and Hispanics to register is sufficient reason for tolerating underrepresentation resulting from use of voter lists. He relies on *Alston* and contends that in that case the minority populations in Connecticut's larger communities could have rectified their underrepresentation on the jury lists by moving in greater numbers to small towns. But the issue does not turn on the physical capacity of minorities to increase their proportion on lists used as sources for prospective jurors. Giving up one's community of residence is a major dislocation. Registering to vote is a simple task of minimal inconvenience, viewed by many as an obligation of citizenship. The Fifth Amendment challenge was properly rejected.

■ 2. *Sixth Amendment Claim.* Mariotta also challenged the Jury Plan as a violation of his rights under the Sixth Amendment and the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–1869 (1988). In *Alston* we recognized that a jury selection system yielding a significant underrepresentation of a minority group in jury venires can violate the "fair cross-section" requirement of the Sixth Amendment, even if proof of discriminatory intent necessary for a Fifth Amendment violation is absent. 791 F.2d at 258; *see Duren v. Missouri*, 439 U.S. 357, 368 n. 26, 99 S.Ct. 664, 670 n. 26, 58 L.Ed.2d 579 (1979). Judge Motley correctly observed that we arguably blurred that distinction in *United States v. Young*, 822 F.2d 1234, 1239–40 (2d Cir.1987), in rejecting a Sixth Amendment challenge to a venire drawn from voter lists. *See United States v.*

---

**4.** Judge Motley questioned whether *Castaneda* established a three-part test for a *prima facie* case or required only substantial underrepresentation of a cognizable group, pointing out that the Supreme Court in *Castaneda* said that " 'a selection procedure that is susceptible of abuse or is not racially neutral *supports* the presump-

tion of discrimination raised by the statistical showing.' " *United States v. Biaggi*, 680 F.Supp. at 651 (quoting *Castaneda v. Partida*, 430 U.S. at 494, 97 S.Ct. at 1280 (emphasis added by Judge Motley)). Nevertheless, the District Judge felt bound by *Alston*. We share her doubts, but feel equally bound by *Alston*.

*Biaggi,* 680 F.Supp. at 653–54. Yet, as she also pointed out, *Young* and *Alston* are reconcilable, *id.* at 654, and we agree with Judge Motley that discriminatory intent is not an element of a Sixth Amendment "fair cross-section" claim.

 The District Judge rejected Mariotta's Sixth Amendment claim on the ground that the degree of underrepresentation was not great enough to violate the "fair cross-section" requirement. In reaching that conclusion, she applied the so-called "absolute numbers" approach, used by this Court in *United States v. Jenkins,* 496 F.2d 57 (2d Cir.1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975). In *Jenkins,* we deemed an underrepresentation too small to violate Sixth Amendment standards where proper representation would have required the addition of only one member of the minority group to a typical venire of 60 persons. Though the "absolute numbers" approach has been called into question, *see Alston v. Manson,* 791 F.2d at 259, we have recently reaffirmed its use. *United States v. Rosario,* 820 F.2d 584, 585 & n. 1 (2d Cir.1987); *see Anderson v. Casscles,* 531 F.2d 682, 685 & n. 1 (2d Cir.1976). The risk of using this approach is that it may too readily tolerate a selection system in which the seemingly innocuous absence of small numbers of a minority from an average array creates an unacceptable probability that the minority members of the jury ultimately selected will be markedly deficient in number and sometimes totally missing. Of course, the Sixth Amendment assures only the *opportunity* for a representative jury, rather than a representative jury itself, *see Roman v. Abrams,* 822 F.2d 214, 229 (2d Cir.1987), *cert. denied,* —— U.S. ——, 109 S.Ct. 1311, 103 L.Ed.2d 580 (1989); *McCray v. Abrams,* 750 F.2d 1113, 1124–25 (2d Cir. 1984), *vacated and remanded,* 478 U.S. 1001, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986), but that opportunity can be imperiled if venires regularly lack even the small numbers of minorities necessary to reflect their proportion of the population.

 In this case, Judge Motley found that addition of two Blacks and two to three Hispanics to a venire of typical size would be required to eliminate underrepresentation, and she concluded that these figures, though larger than those in *Jenkins,* "are not so great as to amount to a violation of the fair cross-section requirement." *United States v. Biaggi,* 680 F.Supp. at 655. We think the facts of this case press the *Jenkins* "absolute numbers" approach to its limit, and would find the Sixth Amendment issue extremely close if the underrepresentations had resulted from any circumstance less benign than use of voter registration lists. Nevertheless, we agree with the conclusion reached by the District Court and reject the Sixth Amendment challenge. We also agree that rejection of the Sixth Amendment claim, in the circumstances of this case, necessarily requires rejection of the statutory claim. *Id.* at 657.

B. *The Government's Peremptory Challenges.* Mariotta contends that the Government used its peremptory challenges to exclude Hispanics, and Biaggi makes the same contention with respect to Italian–Americans. Defendants initially raised their claims immediately after the peremptory challenges were exercised. Judge Motley ordered the defendants to present their claims in written motions, a requirement the defendants acknowledged without objection. However, written motions were not submitted until after the conclusion of the trial. Judge Motley then held a two-day hearing at which one of the prosecutors was questioned extensively about the Government's reasons for challenging members of the venire with Hispanic or Italian surnames.

 The District Judge ruled that the defendants had shown a sufficient pattern of Government use of peremptory challenges against Hispanics and Italian–Americans to constitute a *prima facie* case of discrimination, obliging the Government to demonstrate neutral explanations for its challenges. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *United States v. Alvarado,* 891 F.2d 439 (2d Cir.1989), *vacated on other grounds,* 58 U.S.L.W. 3815 (U.S. June 25,

1990). The Government had challenged four of the six Hispanics and five of the six Italian–Americans chosen for the regular jury, and two of the four Hispanics chosen for service as alternates. Judge Motley then found that the prosecution's explanations for its challenges were neutral and not pretextual, and satisfactorily rebutted the claim of discrimination. These findings have considerable support in the record and are not clearly erroneous. *See United States v. Biaggi*, 853 F.2d 89, 96 (2d Cir. 1988), *cert. denied*, — U.S. —, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989).

 Two aspects of the *Batson* claim merit brief additional comment. First, *Batson* objections should be entertained and adjudicated during the process of jury selection. Though the District Court's preference for written motions in a complex trial is understandable, that preference must give way to the need to resolve a *Batson* claim at the point where prompt corrective action can be taken if the claim is successful. "We recognized in *McCray* [*v. Abrams*, 750 F.2d 1113 (2d Cir.1984),] and *Roman* [*v. Abrams*, 822 F.2d 214 (2d Cir.1987),] that the prosecutor's unwarranted exclusion of cognizable groups should be remedied on the spot, without waiting to see the ultimate composition of the jury." *United States v. Alvarado*, 891 F.2d at 445. Postponing consideration of a *Batson* claim until the trial is in progress, or even completed, as in this case, risks infecting what would have been the prosecutor's spontaneous explanations with contrived rationalizations, and may create a subtle pressure for even the most conscientious district judge to accept explanations of borderline plausibility to avoid the only relief then available, a new trial. *Cf. United States v. Tunnessen*, 763 F.2d 74, 78 (2d Cir.1985) (requiring contemporaneous statement of "ends of justice" continuance under 18 U.S.C. § 3161(h)(8)(A) (1988) to guard against risk that district judge "may simply rationalize his action long after the fact"). The postponement of the *Batson* inquiry is no ground for complaint in this case, however, because the defendants did not object to the requirement of a written motion and did not present the motion until the end of the trial.

 Second, though we accept the District Court's findings as to the prosecution's neutral explanations, we reject the Government's effort to bolster its denial of discrimination by showing how closely the ethnic composition of the jury resembled that of the venire from which it was selected. The composition of the jury may be relevant to rebutting a claim of discrimination in the trial court, *see United States v. Biaggi*, 673 F.Supp. 96, 107 (E.D.N.Y.1987), *aff'd*, 853 F.2d 89 (2d Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989), but the pertinent comparison is between the jury as selected and the racial or ethnic composition of the population of the judicial district, not the composition of the venire drawn for the particular case, *id.* The latter might contain an underrepresentation of a cognizable group compared to the pertinent population. *Cf. United States v. Jenkins*, 496 F.2d at 65. In this case, however, Hispanics were in fact 17.2 percent of the venire, compared to 15.7 percent of the Southern District population.

## III. Challenges to the Sufficiency of the Evidence

A. *The Five Percent Stock Interest.* Richard Biaggi was convicted only of offenses related to the five percent stock interest. He was convicted (a) of aiding and abetting his father's commission of bribery and gratuity offenses based on the stock interest, (b) of mail fraud based on fraudulent concealment of his father's ownership of half of the five percent stock interest (112,500 shares), and (c) of filing false income tax returns by overstating his income to include on his 1983 return receipt of the 112,500 shares and on his 1985 return receipt of gain from the sale of one-third of these shares. He contends that the evidence is insufficient to show that he aided and abetted the bribery and gratuity offenses of his father that were based on the stock interest. For purposes of this appeal, he concedes that the evidence sufficed to show that the Congressman committed bribery and gratuity offenses with

respect to the stock. His primary point is that there is insufficient evidence to show that he knew the stock was issued to influence his father in his official duties (bribery) or because of his father's performance of official acts (gratuity). He also contends that the evidence is insufficient to show that he was holding the 112,500 shares as nominee for his father.

■ Taking these claims in reverse order, we are satisfied that there was sufficient evidence that Richard was holding his father's 112,500 shares as a nominee. The demands by Biaggi and by Ehrlich for Wedtech stock began in 1981. Moreno testified that when Ehrlich became aware of Moreno's nine percent stock interest, he pressed Moreno to honor what he alleged was a prior promise by Mariotta to issue some stock to Biaggi & Ehrlich. In a conversation in 1982, Biaggi made a demand for a five percent override on all contracts that he "could help bring into the company." Wedtech officials rejected that demand, but suggested that they could pay the firm five percent of the subcontracts resulting from such contracts. At this meeting they agreed to issue five percent of Wedtech stock to the firm. There is no evidence that Richard Biaggi was present at or informed of any of the discussions at which the five percent stock interest was demanded or agreed to.

In 1983, in anticipation of the public offering of Wedtech's stock, Biaggi and Ehrlich pressed Wedtech to issue their promised stock interest. An early draft of the agreement for the share transfer provided that 225,000 shares (five percent) would be granted to the law firm of Biaggi & Ehrlich. Later in 1983, Biaggi, Ehrlich, and Richard met with Irwin Wolf, Biaggi's tax accountant, to discuss how the 225,000 shares would be handled. Wolf testified that the law firm was to receive "fees in kind, namely, the stock of the corporation." Wolf was asked whether the Congressman could retain ownership if the shares were issued in the name of the law firm. Wolf said that was not possible because the Congressman had sold his interest in the firm in 1979. Wolf was then asked about the

consequences of placing the Congressman's shares in his own name. Wolf said that, if that occurred, the issuance of the shares would be income to the Congressman in 1983 and that the receipt of such income might put him over the statutory cap on outside earnings. By House Rule XLVII, effective after December 31, 1978, that cap was 30 percent. After these alternatives were rejected, the conclusion was reached "that the stock would have to be registered in the name of Richard, because there didn't seem to be any other alternative." Thereafter, Ehrlich and Richard were each issued 112,500 shares.

Evidence of events after the shares were received supports a finding that Richard was holding his father's stock. In late 1983, when it was proposed that Richard transfer some of the shares to Mariotta to support his claim of Wedtech's entitlement to section 8(a) eligibility, the Congressman decided that the shares would be transferred, despite Richard's objection, and the Congressman dictated special terms, not applicable to other transferors, for the "default" provisions of the transfer to Mariotta. When Richard sold one-third of the shares in 1985, he retained nearly all the proceeds, after using enough for taxes, in a money market account paying approximately seven percent interest, even though he was then paying fourteen percent interest on two mortgage loans. Finally, the evidence undermined any claim that Richard could possibly have been entitled to the 112,500 shares as a member of the firm. When the stock was issued, he had been a lawyer for only nine months, he did little work on the Wedtech account, and he was not listed as a partner in the firm until 1985.

■ Though the evidence amply supports a finding that Richard held the stock as nominee for his father, it fails to support a finding, crucial to Richard's bribery conviction, that he knew the shares were issued for his father's benefit in return for his father's being influenced to assist Wedtech as a Congressman. There was no evidence that Richard heard any of the statements that supported the finding that

the stock was a bribe and an extortion, such as the Congressman's demand for five percent of contracts he brought to Wedtech, a demand that accompanied the negotiation of the five percent stock interest, and the threatening remark that the Congressman could destroy the company.

The Government contends that Richard must have known that the shares were issued to his father for an unlawful purpose because, according to the Government, their value of $1,800,000 exceeded the value of any legal services rendered by the law firm. This speculation is unsupportable. Though the public offering price was $16 per share, the shares issued to Ehrlich and Richard contained a restriction precluding sale within two years. There is dispute as to the value of the restricted shares when issued, but there is no evidence that in 1983 anyone was willing to pay anything near $1,800,000 for 112,500 shares that could not be sold until 1985. The accountants who prepared the 1983 tax returns for Ehrlich and Biaggi valued the 112,500 shares at $34,000, apparently using a book value supplied by Wedtech. Even if the value in fact was somewhat higher, there is no evidence that the value was so high, in relation to the value of past services rendered by the firm, as to lead Richard to believe that the shares must have been issued for an unlawful purpose.

There is sufficient evidence, unchallenged by Biaggi or Ehrlich, that *they* knew why the shares were issued. And it is possible that the Congressman told his son the true reason. But knowledge, though inferable from circumstances, must be based on evidence, not speculation. What little evidence exists as to Richard's knowledge would have supported a finding that he knew that his father's stock was put in his name to circumvent the limits on a Congressman's outside income. Had Richard been charged with aiding and abetting a violation of that restriction, a conviction could stand. But the evidence did not permit a rational jury to find beyond a reasonable doubt that Richard knew that his father received the shares as a bribe or a gratuity, and without evidence of such knowledge, Richard's conviction for aiding

and abetting the bribery and the gratuity may not stand. *See United States v. Zambrano*, 776 F.2d 1091, 1097 (2d Cir.1985) (aider and abetter must have the mental state necessary to convict the principal); *United States v. Perry*, 643 F.2d 38, 46 (2d Cir.) (same), *cert. denied*, 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981).

 The reversal of these counts, however, does not affect Richard's conviction on the two counts charging the filing of false income tax returns. Since the evidence sufficed to show Richard's knowledge that the shares were owned by his father, he was properly convicted of overstating his income to include receipt of the shares and the subsequent profit from their sale. The false tax return counts require knowledge only of the true ownership of the shares, not of the unlawful purpose for which they were issued. As to the mail fraud count, the Government advises only that since Richard's attack on his mail fraud conviction "rests" on his challenge to the bribery and gratuity convictions, it will not "address the mail fraud count separately." Brief for Appellee at 63 n. *. This appears to concede that Richard's mail fraud conviction cannot survive reversal of his bribery conviction, and the mail fraud conviction will therefore be reversed. Reversal of Richard's bribery, gratuity, and mail fraud convictions results in vacation of the $51,000 in fines imposed on those counts but does not reduce his sentence since he received concurrent two-year sentences. Nevertheless, since the District Judge may well have regarded the tax return offenses as aggravated because of their relation to the bribery offense, we think there should be an opportunity for resentencing on the tax return counts, now that the bribery conviction has been reversed. *See United States v. Sperling*, 506 F.2d 1323, 1343 (2d Cir.1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975); *United States v. Rizzo*, 491 F.2d 1235, 1236 (2d Cir.1974).

The Government contends that this opportunity for reconsideration of the sentence should not be afforded, pointing out that we have previously denied the Govern-

ment's request to permit reconsideration of a sentence claimed to be lenient where conviction on a count carrying a more severe sentence is reversed. *See United States v. Pisani,* 787 F.2d 71 (2d Cir.1986). We are not persuaded that claims for reconsideration of sentences must be treated symmetrically. A sentencing judge has the option of imposing a sentence of adequate severity on a less serious count no matter what happens to the sentence on a more serious count. An opportunity to consider increasing a sentence on a minor count after a sentence on a major count is vacated is not required. *See id.* at 75–76. But the initial sentence on a comparatively minor count may well have been influenced upwards in part by a defendant's conviction on serious charges, and the reversal of a conviction on such charges should afford an opportunity for consideration of a reduction of the sentences on the remaining counts, unless the sentencing judge's intent to scale sentences according to the seriousness of the several offenses is clear.

■ B. *The $50,000 Loop Drive Payment.* Ehrlich contends, in an argument that applies as well to Biaggi and Mariotta, that the evidence is insufficient to show that the $50,000 Loop Drive payment was unlawful. It is undisputed that Biaggi & Ehrlich billed Wedtech $50,000 for legal services rendered in connection with the leasing of the Loop Drive property from New York City. That payment formed the basis of Biaggi's convictions for extortion, accepting a bribe, and mail fraud, Ehrlich's convictions for aiding and abetting these offenses, and Mariotta's conviction for bribing Biaggi. The mail fraud convictions rested on the alleged falsity of the law firm's bill in stating that it was rendered for legal services. The issue as to the criminality of the payment is whether the demand for the payment was extortion by Biaggi and whether the payment was a bribe of Biaggi, as the Government contends, or whether the payment was sought and made lawfully as a fee for legal services, as appellants contend. The issue presents difficulties because this case is not the garden variety of extortion/bribery in which a payment is made to a public official who has no colorably lawful claim to it. Where a federal law enforcement officer is paid cash, for example, it will usually be clear that the payment is unlawful; the payment will at least be a gratuity if paid because of his official act, 18 U.S.C. § 201(c)(1)(B), it will be a bribe if paid in exchange for his being influenced in his duties, *id.* § 201(b)(2)(A), and it will be extortion if he demanded it under color of official right, *id.* § 1951(b)(2). However, a payment to a law firm is normally a legitimate payment for services rendered, and the payment does not necessarily become unlawful because the firm used its political contacts to assist its client in a matter that requires governmental approvals, in addition to rendering traditional legal services such as negotiating and drafting a lease. Distinguishing between a lawful fee and an unlawful bribe or extortion is further complicated in this case because the payment alleged to be a lawful fee was received by a firm with which Congressman Biaggi maintained an "of counsel" relationship and in which his son was initially employed and later a partner.

In their approaches to the issue, both sides overstate their contentions. The Government asserts that the $50,000 "cannot be viewed as a simple request for compensation for services rendered" because the law firm "was already handsomely compensated by virtue of its $150,000 retainer." Brief for Appellee at 56. Yet it is not uncommon in the practice of law for legitimate legal fees to be paid in addition to an annual retainer where a law firm handles special tasks and accomplishes significant results. In this case, it is undisputed that lawyers at the firm, particularly Ehrlich and his associate, Carlos Cuevas, Jr., performed legal tasks in negotiating the favorable terms of the Loop Drive lease and drafting its provisions. Though the work was done in a matter of days, it had to be done on an expedited basis and entailed long hours. The lawyers' efforts obtained for their client a waterside property that was essential to performance of a multi-million dollar contract and did so at an annual saving in rent of $75,000 below

the City's asking price for the three-year lease. Appellants contend that the $50,000 was a proper legal fee earned by the firm— as lawful as the $5,000 bonus that Moreno gave to Cuevas, a payment the Government does not challenge.

On the other hand, appellants overstate the matter in urging that the $50,000 was solely for services already rendered and therefore could not have satisfied either the *quid pro quo* element of a bribe or the inducement element of an extortion. The law firm's bill was dated June 19, 1984. The demand for payment and Moreno's agreement on behalf of Wedtech to pay the fee must have occurred before this date.[5] After this date, important steps remained to be taken to assure Wedtech that the lease would be approved. When two members of the Board of Estimate, City Controller Harrison Goldin and Queens Borough President Donald Manes, objected at the Board's June 13 meeting to expedited consideration of the lease the next day, efforts were made to secure approval at a subsequent meeting. Biaggi called Goldin and Simon, and Richard Biaggi asked Simon to talk to Manes. As reported by Ehrlich to Moreno, the Congressman believed that Simon was at fault for not getting the lease on the Board's June 14 agenda, and he talked to Simon about obtaining approval at a subsequent meeting. In Moreno's words, Biaggi "had punished [Simon] . . . had told him that his next election depended on Mario Biaggi's support and that he had to start moving really quick." The $50,000 bill was paid the day after the July 12 meeting of the Board of Estimate.

■■■■ It thus appears, and surely the jury was entitled to find, that the $50,000 payment had two purposes. It was sought in part as compensation for legal services rendered by the law firm. But in part it was also a payment demanded by Biaggi (and directed to his son's firm) to obtain his assistance as a public official in securing favorable action from other public officials.

Biaggi expected to be influenced by the payment to render such assistance, thereby satisfying the *quid pro quo* element of bribery and he obtained the payment, at least in part, by virtue of the action he could be expected to take as a Congressman, thereby satisfying the inducement element of extortion. Only two years previously, in connection with the demand for the five percent stock interest, Biaggi had reminded Wedtech officials that he had "brought up the company to the point it was" and "could also destroy it." Thus, the issue as to the $50,000 payment becomes whether a payment may be found to constitute a bribe and an extortion where it is sought and paid for both lawful and unlawful purposes. We think it may. A valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability. For example, if a Congressman demands a payment for taking official action as to a matter that requires some legal services, his demand is nonetheless extortion if he instructs the payer to retain his son's law firm for the needed legal services and to pay a sum for both the firm's legal services and his own official action. In such cases, however, the evidence must suffice to permit the jury to find beyond a reasonable doubt that the unlawful purposes were of substance, not merely vague possibilities that might attend an otherwise legitimate transaction. A client paying his law firm's legal fee does not commit bribery simply because a Congressman is "of counsel" to the firm and the client hopes the Congressman will some day be helpful. In some cases of payments to service providers who hold public office, the evidence has been deemed insufficient to show any purpose for a payment other than a lawful one. *See United States v. O'Keefe*, 825 F.2d 314, 319–20 (11th Cir.1987).

■■■ In the pending case, several factors permitted the jury to find the $50,-

---

5. Guariglia testified that, after he learned of the agreement to pay the fee, he instructed the firm to refer to the lease in the invoice so that the fee could be amortized over the term of the lease. Though it is possible that the invoice was back-

dated, as Ehrlich suggests, Reply Brief for Ehrlich at 6, the jury was entitled to conclude that it was sent on June 19 and that the agreement as to its amount was reached sometime earlier.

000 payment unlawful. It followed a prior extortionate demand by Biaggi and Ehrlich for a five percent stock interest. It was discussed with a Congressman while matters were pending on which the Congressman's assistance was urgently needed.[6] The bill was submitted just one week after the need for the Congressman's assistance became apparent. The bill was paid the day after the governmental action on which the Congressman had assisted. The bill was not accompanied by normal law firm time records and, though perhaps justified in part by the legal services rendered, was in addition to a substantial retainer. Under all the circumstances the jury was entitled to conclude that the $50,000 was demanded and paid, at least in part, to obtain the political services of Congressman Biaggi. Though it would be helpful in cases like this, where a payment appears to have a lawful purpose in addition to its allegedly unlawful purpose, to focus the jury's attention on the special problems presented by the possibilities of dual motivation, no special charge language was requested on this point. Appellants' complaint is solely that the evidence was insufficient for conviction, and we conclude that it suffices.

C. *Neglia's Bribery Offense.* Neglia mounts a substantial challenge to his bribery conviction on the ground that the evidence showed at most a gratuity violation and did not establish the *quid pro quo* necessary to establish a bribery violation. *See United States v. Myers,* 692 F.2d 823, 841 (2d Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983).

A public official commits a gratuity violation when he accepts something of value, here the promise of a job, "for or because of any official act performed or to be performed." 18 U.S.C. § 201(c)(1)(B). He commits a bribery violation when he accepts something of value "in return for (A) being influenced in the performance of any official act." *Id.* § 201(b)(2). Neglia contends that the job was promised "in gratitude for past services." Brief for Neglia at 69. Testimony of Moreno, Neuberger, and Shorten supports Neglia's claim that the job was promised as a reward for prior assistance.

The Government contends, however, that the job was promised not only as a reward for past services but also in return for being influenced in the performance of official duties in the future. We have recognized, especially with respect to public officials, that evidence of the receipt of benefits followed by favorable treatment may suffice to establish circumstantially that the benefits were received for the purpose of being influenced in the future performance of official duties, thereby satisfying the *quid pro quo* element of bribery. *See United States v. Friedman,* 854 F.2d 535, 554 (2d Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989).[7] After learning of the job promise in the fall of 1984, Neglia acted to assist Wedtech in forestalling its decertification from the section 8(a) program. First, he showed Wedtech officials a copy of a confidential letter Congressman Parrin Mitchell had sent the SBA Administrator raising

---

**6.** Appellants dispute that Biaggi's contacts with Board of Estimate members occurred after the demand for the $50,000. They point to Moreno's testimony quoting Ehrlich as saying that a lot of extra work had been done to convince the Board members, especially Manes. But this statement was made in the context of explaining why the firm's retainer did not cover the additional services and was not necessarily made before those services were rendered nor when the extra payment was first demanded. Though the Government's statement of facts says that Ehrlich demanded the payment after the Board's approval, Brief for Appellee at 34, the fact that the check was dated just one day after the approval and was in response to an invoice dated a month before the Board's July 13 meeting permitted the jury to find that the demand

was made before Biaggi garnered the needed votes.

Alternatively, appellants contend that if the demand preceded the June 19 invoice, it could not have been in anticipation of Biaggi's assistance because, they contend, the first indication that the lease would not be approved expeditiously by the Board, and that Biaggi's assistance was needed, did not occur until the Board's meeting on June 27. However, Cuevas testified that the first indication of opposition occurred on June 13, when an attempt was made to have the matter calendared for action the next day.

**7.** What jury instruction is appropriate in such circumstances is considered at part V(A), *infra.*

questions about Wedtech's continued section 8(a) eligibility. Next he assured Moreno that the response to a subsequent inquiry from Mitchell to the SBA would be prepared "in a form that would not hurt Wedtech." Later he told Moreno and Ehrlich that "he could help" in delaying the process of decertification.

Whether this evidence suffices is a close question. This is not the usual bribery case where a public official accepts cash or some other valuable benefit that is obviously improper. Public officials regularly leave government service to return to private employment and on occasion discuss and formalize private employment opportunities while still in government service. Where that occurs, a specific conflict-of-interest statute prohibits the public official from participating in a matter in which the prospective employer has a financial interest. 18 U.S.C. § 208 (1988). Clearly Neglia's involvement in Wedtech matters after the promise of future employment at Biaggi & Ehrlich violated section 208, since, in the words of the statute, Wedtech had an "arrangement concerning prospective employment" by virtue of its promise to pay one half of Neglia's salary at the law firm. *See id.* § 208(a). But the issue here is whether the arrangement and the activity of Neglia escalated his offense beyond conflict of interest into bribery. That issue is close not only because a job promise is not unlawful under all circumstances but also because it was part of Neglia's duties as an SBA official to assist companies participating in the section 8(a) program.

Nevertheless, we are satisfied that the evidence permitted the jury to find that Neglia accepted the job promise in return for being influenced in his duties. Prior to the job promise, Neglia had already rendered unlawful assistance to Wedtech,

countenancing the sham stock arrangements that misrepresented Mariotta's majority interest in Wedtech and thereby perpetuated the company's participation in the 8(a) program. Some indication that Neglia understood that Wedtech had agreed to contribute to his salary at Biaggi & Ehrlich in the expectation of his continued assistance is inferable from Moreno's statement to Neglia: "We always take care of our friends when they are in government and we never forget them after they leave government." When Neglia was told by Moreno that the initial threat of an investigation by Congressman Mitchell had been "taken care of," Neglia asked, "How did you do it?" and was told, "[T]here is no need for you to know." Neglia never alerted the SBA to these clear indications of improprieties. In fact, the initial investigation was deflected after a payment by Wedtech of $50,000 to Congressman Mitchell's nephews. From all of the evidence the jury could reasonably find that the job promise was more than a gratuitous offer of post-government employment, it was a bribe accepted by Neglia in exchange for his willingness to be influenced in performing his duties for Wedtech's benefit.

D. *Neglia's RICO Conviction.* Neglia challenges his conviction on the RICO substantive count on the ground that, in the circumstances of this case, his predicate acts of accepting a bribe and obstructing justice are insufficient to establish the requisite pattern of racketeering activity.[8] We agree. Predicate act 9 charged the same conduct constituting the bribery offense charged in Count 28—namely, accepting a promise of employment at Biaggi & Ehrlich, with half of his salary to be paid by Wedtech, after he left government employment. Predicate act 15 charged the same conduct constituting the obstruction of justice offense charged in

---

**8.** With respect to the RICO substantive offense, the jury found that Neglia committed three predicate acts—bribery and accepting a gratuity (both of which were based on the promise of future employment) and obstruction of justice. Since the gratuity offense is lesser included within the bribery offense, the bribery and obstruction offenses are the only two predicate acts available to establish the RICO pattern element as to Neglia. With respect to the RICO conspiracy offense, the jury found the obstruction offense not proven, leaving only the bribery offense as a predicate act. As Judge Motley recognized, this single predicate act could not support a RICO conspiracy offense as to Neglia.

Count 30—namely, making false statements "concerning Wedtech and his relationship with B & E" to a Defense Department investigator in preparation for Neglia's appearance before a grand jury.

■■■■■ Preliminarily, as Neglia notes, had the Government charged his false statements as a violation of 18 U.S.C. § 1001 (1988), that offense would not have been eligible for use as a RICO predicate act because section 1001 violations are not within the offenses that define "racketeering activity." See 18 U.S.C. § 1961(1). By charging the false statements as obstruction of justice in violation of 18 U.S.C. § 1503, the Government was able to identify an offense within the category of "racketeering activity." But the fact that an obstruction offense is eligible for use to establish a RICO pattern does not necessarily mean that it suffices in every case. The Government already charges with a heavy hand when it alleges in one count the acceptance of a bribe and in another count the false denial of that same bribe.[9] Before we will countenance a further escalation in the maximum sentence by the addition of a RICO charge, we would have to be persuaded that Congress intended that a bribe and the false denial of that same bribe would satisfy the "pattern" element of a RICO offense. See 18 U.S.C. § 1962(c). We are not so persuaded.

■■■■ Despite the Government's frequent preference to charge a RICO violation whenever evidence indicates two eligible offenses, RICO was not enacted as an automatic sentence enhancement device. If Congress wants the maximum penalty for bribery to be 20 years, it may so provide, but we do not believe a prosecutor can accomplish that result by providing a bribe taker with an opportunity to deny the bribe, and then allege the bribe and the false denial as a RICO "pattern." We have recently made it clear that proof of two predicate acts "without more" does not suffice to establish a RICO pattern. *United*

*States v. Indelicato,* 865 F.2d 1370, 1381 (2d Cir.) (in banc), *cert. denied,* —— U.S. ——, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). Neglia contends that the bribe and the false denial, though obviously bearing the requisite "relationship" to each other, *see Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985), lack the requisite "continuity" to establish a "pattern." That may well be so, but the more basic objection is that aggregating the bribe and its denial into a "pattern" perverts the meaning of that word, at least as it is used in the RICO statute. The "pattern" element guards against permitting RICO to be used against sporadic criminal activity. Neglia's bribe does not cease to be a sporadic offense simply because he later falsely denied committing it. If the commission of an offense and its false denial could establish a "pattern," then *every* offense related to a criminal enterprise would be eligible for inclusion in a pattern whenever the offender falsely denied its commission. That is not what Congress intended.

The Government endeavors to draw support for its position from *United States v. Teitler,* 802 F.2d 606 (2d Cir.1986), pointing out that we there did not suggest any deficiency in a pattern established by a mail fraud offense and an obstruction of justice involving an attempt to induce false grand jury testimony. It is one thing to build a pattern out of an offense followed by an attempt to persuade grand jury witnesses to lie; it is quite a different matter to aggregate an offense and the offender's own false denial of it. In the former case, the offender extends his criminal conduct beyond a denial of wrongdoing. He enlists others into a corruption of justice. In the latter case, the offender simply maintains his innocence. The fact that his denial is false may warrant some enhancement of punishment for his criminal conduct within the statutory range established for his offense, *see United States Sentencing Guidelines* § 3C1.1 (Nov. 1989) (two-level

---

**9.** It should be pointed out that in framing the indictment, the Government did not seek to justify the RICO charge against Neglia solely with the two predicate acts of bribery and obstruction. The indictment charged Neglia with three other predicate acts, all of which the jury found were not proven.

enhancement for obstructing justice); *cf. United States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978) (enhancement for perjury committed at trial), and might, in an extreme case, warrant additional punishment for the separate offense of obstruction. But the false denial does not convert the two offenses into a distinct RICO offense.

 The reversal of Neglia's RICO conviction reduces his aggregate fine by the $10,000 specifically imposed on the RICO count, since his fines were cumulated, but does not necessarily alter his term of imprisonment, since he received concurrent three-year terms on the RICO and the bribery counts. Nevertheless, as with Richard Biaggi's sentence, we think the District Judge should have an opportunity to reconsider Neglia's sentences imposed for the bribery and obstruction offenses, now that these offenses are no longer accompanied by a conviction for the more serious RICO offense.

 E. *Neglia's Obstruction of Justice Conviction.* Neglia contends that the evidence failed to show an obstruction of justice because his statements to a Department of Defense investigator, which constituted the offense, amounted to no more than an "exculpatory no." That doctrine has provided a defense to false statement prosecutions under 18 U.S.C. § 1001 under some limited circumstances. *See United States v. Medina De Perez,* 799 F.2d 540, 543–44 (9th Cir.1986). Even if the doctrine applies to obstruction offenses under 18 U.S.C. § 1503, a matter we do not decide, it would not assist Neglia. We have indicated that the doctrine, if applicable in this Circuit, would have an extremely narrow scope even as to section 1001 offenses. *See United States v. Capo,* 791 F.2d 1054, 1069 (2d Cir.1986), *vacated in part on other grounds,* 817 F.2d 947 (2d Cir.1987) (in banc). In *Capo,* we expressed doubt that any statement beyond a simple "no" would fall within the exception. 791 F.2d at 1069. Neglia's responses to the investigator went beyond bare denials of wrongdoing. He manufactured a false version as to how he happened to handle work for Biaggi & Ehr-

lich after he left the SBA and was actively misleading with respect to his discussions with Ehrlich.

 F. *The Section 8(a) Fraud.* Mariotta challenges his mail fraud convictions based on the section 8(a) fraud on the ground that he was not shown to have devised a scheme to deprive a victim of money or property. Count 31 charged him with mail fraud by misrepresenting his majority interest in Wedtech before the public offering of stock, and Count 13 charged a similar misrepresentation with respect to the sham stock purchase agreements. Both counts alleged a scheme to defraud "the DOD [Department of Defense] of its right to award millions of dollars in Section 8(a) contracts." Mariotta contends that these schemes allege and were shown to involve no more than a deprivation of intangible rights, which he asserts does not constitute mail fraud after *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).

*McNally* required a scheme intended to deprive a victim of money or property, but did not preclude deprivation of intangible property rights, as the Supreme Court made clear in *Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). We agree with Judge Motley, *see United States v. Biaggi,* 675 F.Supp. 790, 801–02 (S.D.N.Y.1987), that Mariotta's schemes were actionable mail frauds that deprived the Department of Defense of its property right to control the award of section 8(a) contracts, even though DOD used the services of SBA to administer the section 8(a) program. *See United States v. King,* 860 F.2d 54, 55 (2d Cir.1988) (mail fraud involving public funds), *cert. denied,* — U.S. ——, 109 S.Ct. 2062, 104 L.Ed.2d 628 (1989); *Ingber v. Enzor,* 841 F.2d 450, 455–56 (2d Cir.1988) (mail fraud involving public contract awarded upon concealment of conflict of interest).

 G. *Simon's $50,000 Payment.* In his reply brief, Simon contends that the evidence was insufficient to permit the jury to find him guilty of extortion and related RICO predicate acts in connection with the $50,000 payment solicited at the Yonkers

Raceway benefit for the Riverdale Hebrew Home. He argues that though Neuberger testified that the payment was demanded in June 1984, just prior to the Board of Estimate vote on the Loop Drive lease, the only evidence that could rationally be believed beyond a reasonable doubt established that the Hebrew Home benefit attended by Simon and Neuberger occurred in November, not June. His point is that the demand for $50,000 in November could not have been misuse of his office in connection with the Loop Drive lease, which was approved by the Board of Estimate in July.

Simon's sufficiency challenge fails both because it was not preserved at trial and because of the nature of the factual issues presented to the jury. In his Rule 29 motion for a directed verdict at the close of the evidence, Simon initially raised his current claim that the Neuberger testimony about a June meeting was conclusively refuted by records and photographs showing the attendance of Simon and Neuberger at the November benefit for the Hebrew Home, not the earlier June benefit. Opposing Simon's motion, the Government took the position that if the demand for $50,000 was made in June, it related to the upcoming Board of Estimate vote in July, or, alternatively, if it occurred in November, it was nonetheless extortionate because of its relationship to Simon's continued dealing with New York City officials in connection with completion of the Loop Drive transaction and acquisition of an additional property. Counsel for Simon then told Judge Motley that if the Government was going to argue that the meeting occurred in June, "that is an issue of fact for the jury." He concluded, "If that is what [the prosecutor] is representing to the Court, then deny my motion."

In its summation, the Government briefly adverted to Neuberger's recollection of the meeting as having occurred in June but essentially accepted the defense contention that the benefit that Simon and Neuberger attended had occurred in November. The prosecutor argued that Neuberger could not be expected to remember the precise date of the benefit, that Ceil Lewis had placed the meeting in November, and that the first check paid in response to Simon's demand was dated November 27. "It probably was the November meeting," the prosecutor acknowledged. Rather than claim that the meeting happened in June, the prosecutor argued that it made no difference whether the extortionate demand was made at a meeting in June or November because in November the Loop Drive lease, though approved by the Board of Estimate, still had not been executed and Simon's help was needed to complete the transaction. Simon's summation maintained that Simon and Neuberger had attended only the November benefit and that no demand for money had been made at that time or at any other time. His defense was that at Simon's home the following January Neuberger volunteered to make political contributions. Thus, the jury was never called upon to determine whether the meeting occurred in June; the fact issue was whether at the November meeting a demand for $50,000 had been made. If it was, as the jury evidently found, there was ample evidence that it was an extortionate demand, induced by misuse of office.[10]

## IV. Conduct of the Trial

All defendants allege a variety of errors occurring during the course of the trial. We consider those raising issues of arguable merit.

---

**10.** Simon also contends that in shifting from a June meeting to a November meeting, the Government has constructively amended the indictment in violation of the Fifth Amendment. The count charging Simon with extortion of $50,000 alleged conduct beginning in mid–1984 and continuing through early 1986; the RICO counts more specifically alleged that Simon's demand for $50,000 occurred in "mid–1984." In any event, the evidence of a November de-

mand did not constitute a modification of an essential element of the offense that amounts to an amendment of the indictment, *see United States v. Weiss*, 752 F.2d 777, 787 (2d Cir.), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985). At most, there was a non-prejudicial variance, *see United States v. Attanasio*, 870 F.2d 809, 817 (2d Cir.1989); *United States v. Heimann*, 705 F.2d 662, 666 (2d Cir.1983).

A. *Use of Immunized Testimony.* Mariotta and Richard Biaggi contend that the prosecution made use of testimony they had given to a New York state grand jury under grants of immunity and that Judge Motley erred in ruling, without holding a so-called *Kastigar* hearing, *see Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), that the Government had adequately demonstrated its independent sources for its evidence. Mariotta and Richard Biaggi testified under grants of immunity to a grand jury empaneled by the Manhattan District Attorney. The testimony was reviewed by Judge Motley. Mariotta denied knowledge or participation in any criminal conduct at Wedtech. Richard Biaggi testified concerning two episodes of bribery. One involved efforts by Wedtech and Ehrlich to make payments, through a company known as Portatech, to General Vito Castellano of the New York State National Guard. The other involved payments on behalf of Citisource, Inc. from former Bronx County Democratic Chairman Stanley Friedman, through Portatech, to Ehrlich, who was a general in the National Guard. *See United States v. Friedman,* 854 F.2d at 547–50. Judge Motley ruled, at the conclusion of the trial, that the transcripts of the testimony given under grants of immunity and the trial record in this case demonstrated, without the need for a hearing, that the Government's case was derived from sources independent of the immunized testimony.·

Preliminarily, the Government contends that appellants failed to sustain their burden of showing that their immunized testimony related to the charges in this case. *See Kastigar v. United States*, 406 U.S. at 460, 92 S.Ct. at 1664; *In re Corrugated Container*, 644 F.2d 70, 75 (2d Cir.1981). Mariotta's denials disclosed no fact relevant to the instant charges. Richard's testimony concerned Wedtech and bribery, but the charges in this case did not involve the Portatech bribes. The Government's evidence made fleeting and inconsequential reference to Castellano, but not to any attempt by Wedtech to bribe him. The Castellano bribe was elicited on cross-ex-

amination by counsel for Ehrlich and Richard Biaggi.

Moreover, the Government established its independent source for the one Portatech document that it used during the trial, an invoice from Portatech to Wedtech that bore Richard Biaggi's home address. This document was used to cross-examine Richard's wife concerning her knowledge of her husband's business dealings. The document was obtained from Wedtech pursuant to a subpoena issued in July 1986, before Richard's state grand jury testimony in December 1986.

Appellants contend that Richard's grand jury testimony and even Mariotta's denials of wrongdoing were "used" against them in the sense that they provided the motivation for the four cooperating Wedtech witnesses to testify. In *United States v. Kurzer*, 534 F.2d 511, 517–18 (2d Cir. 1976), we recognized that the self-incrimination protection assured by *Kastigar* could be violated if it were shown that a witness was motivated to come forward with evidence against a defendant because of that defendant's immunized testimony. At the same time we pointed out that the Government should have the opportunity to persuade the trial judge that the witness would have provided adverse testimony entirely apart from the motivating effect of the immunized testimony, thus applying a *Mt. Healthy* dual motivation analysis. *See Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

In this case, the cooperating witnesses were extensively questioned during the trial as to their motivations for deciding to cooperate with the prosecution and testify against the defendants. Not one of them said they were motivated by anything that Mariotta or Richard Biaggi had said to the New York grand jury. At most, their testimony indicated that their decision to cooperate was influenced not only by the prospect of extensive federal prison terms that might result from the federal investigation of which they were aware but also by the prospect of state prison terms resulting from the investigation by the Manhattan

District Attorney. Such testimony did not preclude Judge Motley from finding that the Government's evidence from the cooperating witnesses was independent of the immunized testimony, *i.e.*, that it would have been volunteered even if such testimony had not been given. Her finding is especially invulnerable in view of the fact that the motivation argument tendered by the appellants rests on a claim that the witnesses cooperated because they had heard generally about the state investigation, rather than any supportable claim that they had been motivated by anything that either Mariotta or Richard had said to the state grand jury.

Judge Motley did not err in finding no violation of the *Kastigar* principles nor in declining, after assessing the entire trial record, to hold a *"Kastigar* hearing."

■■■ B. *Evidence of Mariotta's "Consciousness of Innocence."* Mariotta contends that it was error to exclude evidence of immunity negotiations that he contends was admissible to prove his "consciousness of innocence." Specifically, Mariotta sought to prove that the Government had offered him immunity if he would give what the Government regarded as truthful information regarding wrongdoing by other Wedtech officers and various public officials, and that Mariotta, in response to this offer, denied knowledge of any such wrongdoing, thereby "rejecting" immunity. The Government does not dispute that it made the offer, but contended before the District Court that the prosecution had rejected immunity for Mariotta after reaching the conclusion that the testimony he would give, based on his denial of knowledge of wrongdoing, was not credible. Mariotta argued to the District Court that his denial of knowledge of others' wrongdoing, expressed to the Government at a time when admitting such knowledge would have secured him immunity from prosecution, is powerful evidence of "consciousness of innocence," tending to preclude a finding that he had such knowledge.

Initially, the Government disputes Mariotta's claim that he rejected immunity; in the Government's view, it was the Government that rejected immunity. The distinction is of no moment. Even on the Government's view of the matter, it rejected immunity because Mariotta did not come forward with incriminating evidence about Wedtech officers and public officials. But that is precisely the point Mariotta wanted the jury to know: that he had a chance to gain immunity for himself if he told the Government about the wrongdoing of Wedtech officers, and that he denied knowledge of such wrongdoing at a time when admitting he had such knowledge would have assured him immunity. The available inference is that he really lacked such knowledge, as he claimed throughout the trial. The inference is the same whether the immunity offer is viewed as "rejected" by Mariotta's inability to satisfy the Government's condition or "rejected" by the Government's assessment that its condition was not satisfied.

The Government also contends that evidence of immunity negotiations should be excluded because of the same considerations that bar evidence of plea negotiations. Preliminarily, we note that plea negotiations are inadmissible "against the defendant," Fed.R.Crim.P. 11(e)(6); Fed.R.Evid. 410, and it does not necessarily follow that the Government is entitled to a similar shield. More fundamentally, the two types of negotiations differ markedly in their probative effect when they are sought to be offered against the Government. When a defendant rejects an offer of immunity on the ground that he is unaware of any wrongdoing about which he could testify, his action is probative of a state of mind devoid of guilty knowledge. Though there may be reasons for rejecting the offer that are consistent with guilty knowledge, such as fear of reprisal from those who would be inculpated, a jury is entitled to believe that most people would jump at the chance to obtain an assurance of immunity from prosecution and to infer from rejection of the offer that the accused lacks knowledge of wrongdoing. That the jury might not draw the inference urged by the defendant does not strip the evidence of probative

force. *See United States v. DiMaria*, 727 F.2d 265, 271–72 (2d Cir.1984).

Rejection of an offer to plead guilty to reduced charges could also evidence an innocent state of mind, but the inference is not nearly so strong as rejection of an opportunity to preclude all exposure to a conviction and its consequences. A plea rejection might simply mean that the defendant prefers to take his chances on an acquittal by the jury, rather than accept the certainty of punishment after a guilty plea. We need not decide whether a defendant is entitled to have admitted a rejected plea bargain. *Cf. United States v. Verdoorn*, 528 F.2d 103 (8th Cir.1976) (approving exclusion of a rejected plea bargain offered by a defendant to prove prosecutor's zeal, rather than defendant's innocent state of mind). The probative force of a rejected immunity offer is clearly strong enough to render it relevant. Fed.R.Evid. 401. As Dean Wigmore has written:

> Let the accused's whole conduct come in; and whether it tells for consciousness of guilt or for consciousness of innocence, let us take it for what it is worth, remembering that in either case it is open to varying explanations and is not to be emphasized. Let us not deprive an innocent person, falsely accused, of the inference which common sense draws from a consciousness of innocence and its natural manifestations.

2 *Wigmore on Evidence* § 293, at 232 (J. Chadbourn rev. ed. 1979).

██ It is a closer question whether the District Judge exceeded her discretion under Fed.R.Evid. 403 to bar relevant evidence whose probative value is outweighed by the danger of unfair prejudice, confusion, or delay. On this point we note first that the District Judge appears to have excluded the evidence primarily, if not entirely, on the ground that the evidence was not relevant, that it contributed no probative force beyond the defendant's entry of a "not guilty" plea. But Rule 403 concerns may well have influenced the exclusion ruling; the Court at one point inquired whether a hearing would be necessary to determine if an immunity offer had been made, though Mariotta's basic claim concerning the offer was not disputed. Though we recognize the latitude of a district judge in making Rule 403 determinations, we conclude that in this case, the exclusion of Mariotta's state of mind evidence denied him a fair trial.

Mariotta's basic defense was that he was unaware of any criminal wrongdoing at Wedtech, that he was an innocent victim of the machinations of the sophisticated businessmen whom he had brought into the company to handle its financial affairs. That defense was seriously in issue as to most of the charges against him, drawing considerable support from the evidence. Mariotta was a tool and die worker, with a limited ability to read and write. He dropped out of a vocational high school after one year. At Wedtech, he tended to the production side of the business; the cooperating witnesses who testified for the prosecution handled the business and financial side.

Though the Government presented abundant evidence that Wedtech officials paid bribes to numerous officials, there was a serious dispute as to whether Mariotta knew of the bribes. The principal evidence of his knowledge of the illegal activities was the testimony of the four cooperating witnesses whose accusations were subject to considerable doubt. Neuberger acknowledged that Moreno, Guariglia, and Shorten excluded Mariotta from numerous aspects of the company's affairs, despite his role as chairman. Guariglia testified that after he became president of Wedtech, he regarded Mariotta as a nuisance. Ultimately the cooperating witnesses forced Mariotta out of the company.

One episode casts serious doubt on whether the accusers truthfully testified that Mariotta knew of their illegal activities. Moreno acknowledged that during the public offering of Wedtech stock, the company had arranged to have some of the shares purchased and "parked" on the understanding that the "purchasers" would be paid for their services and for any losses. Wedtech provided one million dollars to a consulting firm to distribute the re-

quired payments. When an outside director of Wedtech, Paul Hallingby, conducted an investigation into this stock fraud scheme in 1986, after Mariotta had left the company, Moreno, Neuberger, Guariglia, and Shorten all sought to frame Mariotta of securities fraud by telling Hallingby that Mariotta had arranged the one million dollar payment, although, as Moreno admitted at trial, Mariotta had nothing to do with the transaction. Moreno also admitted that Neuberger, Guariglia, and he had discussed having Mariotta murdered so that Wedtech could collect as beneficiary of a $15 million policy on Mariotta's life.

With the credibility of the accusations about Mariotta's knowledge of wrongdoing seriously challenged, evidence of his denial of such knowledge in response to an opportunity to obtain immunity by admitting it and implicating others became highly significant to a fair presentation of his defense. The unfairness of preventing his presentation of evidence of his consciousness of innocence was exacerbated when the Government presented evidence of his consciousness of guilt. This consisted primarily of the action of his wife, shortly after the cooperating witnesses pled guilty, in withdrawing $3.5 million from a joint account she and her husband maintained and using it to purchase gold bars and other investments in her own name.

Where evidence of a defendant's innocent state of mind, critical to a fair adjudication of criminal charges, is excluded, we have not hesitated to order a new trial. *See United States v. Detrich,* 865 F.2d 17 (2d Cir.1988); *United States v. Kohan,* 806 F.2d 18 (2d Cir.1986); *United States v. Harris,* 733 F.2d 994 (2d Cir.1984); *United States v. DiMaria, supra.* Whether the error in excluding evidence of Mariotta's innocent state of mind warrants a new trial on all charges requires further consideration. He was convicted of RICO substantive and conspiracy offenses, two bribery offenses based on the five percent stock transfer and the $50,000 Loop Drive payment, two mail fraud offenses based on the false claim of majority stock ownership at the time of the original section 8(a) application and the subsequent section 8(a) sub-

missions after the public offering and the sham stock purchase agreements, and four tax evasion offenses based on unreported receipt of funds from the FHJ account in 1981, 1982, 1984, and 1985. The issue in dispute as to some of these counts was whether Mariotta had knowledge of the unlawful activities of other Wedtech officials and of Biaggi. That issue was central to the Loop Drive bribery, which required a finding that Mariotta knew that the payment was demanded and made for Biaggi's political influence, rather than for legal work. It was also critical to the five percent stock bribery; though Mariotta unquestionably knew of the transfer, he did not necessarily know that issuance of the stock was a bribe. On the other hand, Mariotta's knowledge of the wrongdoing of others had little if anything to do with his mail fraud and tax offenses. There was strong evidence that he and Neuberger were 50–50 partners when he falsely claimed to the SBA that he owned two-thirds of the company, and the evidence was also clear that he was not the bona fide owner of more than 51 per cent of the stock when the sham stock purchase agreements were arranged to support an appearance of majority ownership. His guilt on the tax offenses turned on the credibility of his claim, unsupported in the evidence, that his withdrawals from the FHJ account represented repayments of loans he had made to Neuberger.

Thus, the erroneous exclusion of evidence supporting the inference that Mariotta was truthfully denying knowledge of the wrongdoing of others might well have affected the jury's verdicts on the bribery counts, but was not significant with respect to the mail fraud and tax counts. The effect of the exclusion on the RICO counts is problematic. In addition to the bribery offenses, the two mail fraud offenses were charged as RICO predicate acts and found to be such by the jury in its answers to interrogatories. *See United States v. Ruggiero,* 726 F.2d 913, 922–23 (2d Cir.1984); *id.* at 925–28 (Newman, J., concurring in part). Thus, we face no issue as to whether the jury found that Mariotta

participated in the conduct of the affairs of a RICO enterprise through a pattern that included at least two predicate acts. *See Brennan v. United States*, 867 F.2d 111, 114–16 (2d Cir.1989). Our question is whether, had the excluded evidence been admitted, the jury would have found that Mariotta not only committed the two mail fraud offenses but did so as part of a pattern of racketeering activity by which he participated in the conduct of the affairs of a RICO enterprise.

In some circumstances, the jury's findings of two predicate acts, lawfully constituting a RICO pattern, and of the other elements of a RICO offense, will permit affirmance of a RICO conviction notwithstanding the invalidation of other predicate acts. We decline to reach that conclusion here. The allegations of bribery and extortion dominated this prosecution. If a jury, informed of the evidence supporting Mariotta's claim that he lacked knowledge of the wrongdoing of others, found that the Government had not proved such knowledge beyond a reasonable doubt and for that reason acquitted him of the bribery offenses, we think it at least questionable whether such a jury would nonetheless have convicted him of the RICO offenses, notwithstanding his commission of the two mail fraud offenses. The excluded evidence might have sufficed to persuade a jury in general not to convict him of the RICO offenses, or, more technically, might have provided a basis for declining to find that the two mail fraud offenses constituted a RICO pattern, even though they were legally sufficient. Under the circumstances, neither the bribery nor the RICO convictions may stand.

Reversal of the bribery and RICO convictions does not require reconsideration of the sentences on the mail fraud and tax counts. Unlike the situation of Richard Biaggi and Neglia, where the vacated counts carried sentences equal to sentences on other counts, Mariotta's vacated counts carried sentences far more severe than the sentences on the remaining counts.[11] Under these circumstances, we can be confident that Judge Motley carefully scaled the sentences in relation to her assessment of the severity of the offenses, avoiding the risk that the sentences on the mail fraud and tax counts might have been selected partly to reflect the seriousness of the bribery and RICO convictions.

C. *Biaggi's Claim Concerning His State of Mind.* Biaggi contends that the District Court erred in excluding evidence of his state of mind concerning his belief that the shares issued to Richard Biaggi were Richard's property and not merely held by him as nominee for his father. Specifically, he sought to offer testimony of Richard's wife that on one occasion Richard offered to use part of the proceeds from sale of the shares to repay a loan to his father, and the father refused. On another occasion, Richard offered to transfer ten percent of the shares in his name to his father, an offer his father initially refused and then agreed to only on the condition that the accountants would assure him that such a transfer was lawful, a condition that was not fulfilled.

Whether or not Judge Motley was correct in her initial ruling that this testimony was inadmissible hearsay, we agree with the Government that Biaggi explicitly declined to press for admission of this testimony in the face of the Government's assertion that admission of evidence to support a claim that Biaggi thought the stock was his son's would permit introduction of similar act evidence in rebuttal to show prior occasions when Biaggi had used his children to mask his improper transactions. The matter was discussed with Judge Motley in extended colloquies, after which she stated her understanding that counsel for the Congressman and other defense counsel "are now willing to limit the offer to the state of mind of Richard Biaggi, is that right?" to which the Congressman's counsel replied, "That is correct, Your Honor." In accordance with that understanding,

---

**11.** Mariotta was sentenced on the RICO counts to eight-year terms, on the bribery counts to five-year terms, and on the mail fraud and tax counts to two-year terms, all terms to run concurrently.

Richard's wife was then permitted to testify to conversations she had with Richard that bore on Richard's state of mind concerning ownership of the stock, but did not testify further as to what the Congressman said or as to his presence at some of the conversations. Having elected, for understandable tactical reasons, not to press for admission of the evidence to show the Congressman's state of mind, Biaggi cannot complain on appeal about the consequences of his decision.

██ To the extent that Richard complains of a limitation on admission of some of his wife's testimony offered to show *his* state of mind concerning stock ownership, the excluded evidence bore only tangential relevance to Richard's state of mind, and the limitations were not error in view of the testimony his wife presented concerning his conversations about the stock and his offer of payment to his father.

██ D. *Biaggi's Claim Concerning "the Meese Defense."* Biaggi contends that the District Court's rulings denying certain document requests and trial subpoenas precluded him from presenting what was referred to as "the Meese defense." Specifically, Biaggi sought to subpoena senior Executive Branch officials including Edwin Meese, who was then Attorney General of the United States and had been White House Chief of Staff at the time Wedtech was awarded its major government contracts, and to obtain documents showing the involvement of Meese and other officials in obtaining government contracts for Wedtech. Biaggi wanted to show that since Wedtech already had the aid of the Republican White House, aid obtained by payment of large "lobbying" fees of questionable legality, the company had no need to bribe a Democratic congressman.

In view of the considerable extent to which "the Meese defense" became known to the jury, Judge Motley acted well within her discretion in rejecting requests for documents and testimony that would have greatly expanded the scope of an already wide-ranging trial. From the four cooperating witnesses, the defense established

the considerable role played by Meese in assisting Wedtech in its dealings with the Executive Branch and the substantial payments made to Meese's advisor, lawyer/lobbyist E. Robert Wallach, who received $800,000 and one percent of Wedtech's stock for exercising his influence with Meese. The testimony included an allegation that Wallach had agreed, for payments of $100,000 each from Moreno and Guariglia, to use his influence with Meese to "fix" their cases and guarantee that their sentences would not include jail terms.

The prosecution made no attempt to dispute the allegations of Meese's involvement on behalf of Wedtech or the unlawfulness of that involvement. The prosecution's response in summation was that Wedtech "bribed a whole ream of people ... everyone including these people [the defendants]." The prosecution argued that Wedtech had unlawfully sought to influence both the Executive and the Legislative Branches: "[W]hatever they did with Meese was wrong, but that was done separately in the Executive Branch." The prosecution's position was clearly stated, "[O]ur office referred the allegations regarding Mr. Meese to Washington because the law doesn't permit us to prosecute our own boss." The prosecutor added, in a memorable phrase, "Meese was a sleaze."

## V. Jury Charge

A. *Simon's Extortion Offenses.* In explanation of the "inducement" element of extortion, Judge Motley charged the jury as follows:

> [I]f the defendant repeatedly accepted money or benefits from representatives of Wedtech, and if the amount of money or benefits accepted could reasonably have affected the defendant's exercise of his duties, then you may find defendant induced the payment of money.

Simon specifically objected to this portion of the charge, contending that it permitted the jury to infer inducement from receipt

of entirely lawful campaign contributions.[12] The Government contends that this portion of the charge was expressly approved by a majority of this Court in *United States v. O'Grady*, 742 F.2d 682 (2d Cir.1984) (in banc). The Government's reliance on *O'Grady* is a classic example of the danger of enlisting language from an appellate opinion to serve in situations beyond the point at issue that occasioned the language.

The defendant in *O'Grady* was an official of the New York City Transit Authority. His duties included selecting vendors and assuring contract compliance. The evidence established that over a nine-year period he had accepted $30,000 worth of various forms of entertainment from Transit Authority vendors. This Court, in banc, held that it was error to charge that "the mere acceptance of benefits by a public official is extortion under color of official right if the official knew that his office was the motivation behind the giving of the benefits." *Id.* at 687. However, eight members of the Court expressed the view that, upon retrial, the jury should be instructed that it could infer inducement upon a finding of *"repeated* acceptances over a period of time of *substantial* benefits (i.e., benefits of a nature and magnitude which reasonably could affect a public official's exercise of his or her duties)," *id.* at 694 (Pierce, J., concurring) (emphasis added); *id.* at 694–95 (Newman, J., concurring).

The *O'Grady* standard, permitting an inference of inducement from repeated acceptance of substantial benefits, makes sense as applied to an appointed official who has no lawful basis for receiving cash or other benefits from those conducting business with his agency. It does not apply, however, to an elected official who may lawfully receive campaign contributions. Permitting an inference of inducement from an elected official's repeated acceptance of substantial benefits would subject every recipient of campaign contributions to conviction for extortion.

When an elected official who has received campaign contributions is charged with extortion and with receiving bribes, the charge must carefully focus the jury's attention on the difference between lawful political contributions and unlawful extortionate payments and bribes. If the Government's claim concerns payments that neither the donor nor the public official contends are campaign contributions, the distinction can be easily explained. However, if the Government contends that money paid to an official as a campaign contribution was extorted or paid as a bribe, the distinction requires considerable explanation. It will not be sufficient, as the Government suggested at oral argument, simply to tell the jury that whether a payment is a lawful campaign contribution or an unlawful extortion or bribe is a matter to be resolved based on all the evidence in the case. We need not attempt to identify all the pertinent factors that might bear on the issue, but we can suggest that they include whether the contribution was reported, whether it was unusually large compared to the contributor's normal donations, whether the official threatened adverse action if the contribution was not made, and how directly the official or those soliciting for him linked the contribution to specific official action to be taken by the official.

There is a line between money contributed lawfully because of a candidate's positions on issues and money contributed unlawfully as part of an arrangement to secure or reward official action, though its location is not always clear. *See United States v. Brewster*, 506 F.2d 62, 78–83 (D.C.Cir.1974); *see generally* J.T. Noonan, Jr., *Bribes* 621–51 (1984). The laws governing extortion and bribery may sometimes be too blunt to be used as instruments to police that line, though cases may be imagined where egregious facts, submitted to a jury under careful instructions, would permit a conviction for bribery based on campaign contributions. Fortunately,

---

**12.** A similar charge was given with respect to the offense of bribery:

[Y]ou may infer guilt from evidence of benefits received and subsequent favorable treatment....

this case does not require precise delineation of that line, nor, under the circumstances, does the inapplicable charge language from *O'Grady* warrant reversal of Simon's conviction for extortion.

There was no issue put to the jury in Simon's case as to whether any payment was a lawful political contribution or an unlawful extortion or bribe. Neither the Government nor Simon contended that the Lawrence kickbacks or the job for Bittman were campaign contributions. As to the $50,000 demanded at the Yonkers Raceway, it was the Government's contention that this was a campaign contribution that Simon had extorted, but Simon defended, not on the ground that the money was a lawful contribution, but on the ground that the demand was never made and the money was never received or paid on his behalf. He denied any demand for money at the Yonkers Raceway, either in June 1984, when the Government initially alleged that he was present with Neuberger, or in November 1984, when, according to the plausible evidence in the case, he was present with Neuberger. He testified that at a January 1985 condolence call at Simon's home, Neuberger volunteered that Wedtech officials would contribute $50,000 to his campaign and that in fact $10,000 was contributed by Neuberger and $5,000 by Moreno.

The jury was never asked to decide whether this $15,000 of campaign contributions was unlawful. These contributions did not appear on the Government's list of items, based on Ceil Lewis's testimony, showing the disbursement of funds from the FHJ account to political organizations, synagogues, and restaurants, allegedly at Simon's direction. Included on the list was $10,000 in cash that Lewis testified she handed in a sealed envelope to Lawrence for delivery to Simon, a delivery Lawrence testified he made. The Government alleged that, all told, nearly $50,000 was taken from the FHJ account for Simon's purposes. Simon claimed he never demanded the $50,000 nor directed its disbursement. He specifically denied receiving $10,000 in cash in an envelope from Lawrence. The jury resolved these factual issues against

him by convicting him on Count 19, which charged extortion of $50,000 in cash, contributions, and expenses.

Moreover, the jury charge on extortion included language requiring a finding that the defendant acted "unlawfully" and specifically defined extortion under color of right as the "misuse" of public office to secure payment of money. In light of the factual issues framed by the parties' contentions, these passages of the jury charge provide adequate assurance that Simon suffered no prejudice by the erroneous inclusion of the "pattern of benefits" language from *O'Grady*.

B. *Simon's Tax Offense.* Count 23 charged Simon with income tax evasion for the year 1985 by failing to pay taxes on three categories of income—the $50,000 of benefits demanded at the Yonkers Raceway, the Lawrence kickbacks, and the $9,000 worth of tile and labor furnished by Fogliano. Simon alleges error with respect to the charge concerning the Fogliano payment, specifically, the failure to charge, as requested, that if Simon intended to pay for the work done and the materials supplied by Fogliano, there is no income to report. In instructing the jury as to receipts that do not constitute reportable income, Judge Motley included "a purchase of services given on credit." The Government contends that Simon failed to object to the omission of his requested language and that the charge adequately covered Simon's point.

At the conclusion of the charge, Simon objected generally to the Court's failure to include requested instructions, but did not complain of the precise wording of the charge on reportable income. Generally, the proffer of a requested instruction does not excuse a defendant from the need to object specifically to its omission from the charge in order to preserve the issue for appeal. *See United States v. Friedman,* 854 F.2d at 554–56. A general complaint of failure to give requested instructions might suffice to preserve a claim concerning a request fully considered and denied by the trial court at a charge confer-

ence and wholly omitted from the charge, but where the topic is covered in the charge, a complaint that the charge language incorrectly or inadequately covers the topic must be specifically called to the Court's attention after the charge is given. Counsel is obliged to state "distinctly" the grounds of his objection. Fed.R.Crim.P. 30.

■ In this case, the Court charged on the topic of reportable income, but erred in failing to instruct on the defense contention. It was not Simon's point that Fogliano had extended credit, giving Simon a period of time in which to pay an incurred liability; the claim, supported by the evidence, was that Fogliano had not completed the work nor sent a bill and that Simon had no obligation to pay until the work was completed and billed. But this is precisely the type of distinction that requires a specific objection to the wording of a charge.

In the circumstances of this case, the omission of the requested charge was not plain error. As demonstrated by their conviction of Simon on the substantive counts of extortion concerning the $50,000 in benefits and the Lawrence kickbacks, the jurors clearly found that he had received reportable income in 1985. Even if a correct instruction governing the Fogliano payment had been given, there is no reasonable possibility that the verdict on the tax count would have been different.

■ C. *Ehrlich's Defense to the Five Percent Stock Interest.* Ehrlich contends that the District Court mischaracterized his defense to receipt of half the five percent stock interest. His counsel argued in summation, and several witnesses testified, that the five percent interest was given to Ehrlich and Richard Biaggi in appreciation of the forbearance of Biaggi & Ehrlich to bill for all legal services rendered or to press for payment of bills rendered in the early days before Wedtech became successful—for "stay[ing] with us in the hard times," as one witness put it. Judge Motley characterized the defense contention to be that the stock was issued in payment for past legal services. Ehrlich contends this obscured the defense to the extent that it was based on receipt of stock for loyalty in general, rather than as compensation for particular services rendered. Though it would have been preferable to characterize the defense as counsel wished it put, *see United States v. Pedroza,* 750 F.2d 187, 205 (2d Cir.1984), *cert. denied,* 479 U.S. 842, 107 S.Ct. 151, 93 L.Ed.2d 92 (1986), Judge Motley's formulation did not affect the substantial rights of any defendant. Ehrlich's lawyer himself told the jury, at one point, that the stock had been given "in payment for past legal services rendered," The "loyalty" rationale was not so distinct from the motivation of paying for past services that it had to be separately mentioned by the District Judge.

## CONCLUSION

Each of the six appellants was fairly convicted on at least two counts. We have considered all of the many additional issues raised on this appeal and conclude that none warrants any relief beyond what we have ordered in this opinion.

With respect to Richard Biaggi, his convictions on Counts 4, 5, and 6 are reversed, and these counts are dismissed; the sentences imposed on Counts 16 and 17 are vacated, and these counts are remanded for resentencing. With respect to Peter Neglia, his conviction on Count 1 is reversed, and this count is dismissed; the sentences imposed on Counts 28 and 30 are vacated, and these counts are remanded for resentencing. With respect to John Mariotta, his convictions on Counts 1, 2, 42, 43, and 44 are reversed, and these counts are remanded for retrial.[13] In all other respects, the convictions and sentences of these defendants and of Mario Biaggi, Bernard Ehrlich, and Stanley Simon are affirmed.

---

13. Count numbers in this paragraph are those used in the judgments of conviction, not those in the redacted indictment submitted to the jury on which the jury verdicts were based.