**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RONALD L. WATKINS,
Petitioner-Appellant,

v.

No. 97-9

RONALD J. ANGELONE, Director,
Virginia Department of Corrections,
Respondent-Appellee.

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
James C. Turk, District Judge.
(CA-94-263-R)

Argued: October 30, 1997

Decided: January 7, 1998

Before MICHAEL, Circuit Judge, BUTZNER,
Senior Circuit Judge, and BULLOCK,
Chief United States District Judge for the
Middle District of North Carolina, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Mark Evan Olive, VIRGINIA CAPITAL REPRESEN-
TATION RESOURCE CENTER, Richmond, Virginia, for Appellant.
Robert Quentin Harris, Assistant Attorney General, OFFICE OF THE
ATTORNEY GENERAL, Richmond, Virginia, for Appellee. **ON**

**BRIEF:** Robert E. Lee, Jr., VIRGINIA CAPITAL REPRESENTA-TION RESOURCE CENTER, Richmond, Virginia, for Appellant. Richard Cullen, Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

PER CURIAM:

The petitioner, Ronald Watkins, applied for a writ of habeas corpus in the Western District of Virginia following his conviction and death sentence in the Circuit Court of Danville, Virginia. He appeals the district court's denial of the writ on three grounds. First, Watkins alleges that the racial composition of the jury pool caused his death sentence to be tainted by discrimination. Second, he charges his trial counsel with ineffective assistance for failing to make certain objections during the trial and for making a closing argument to the sentencing jury that Watkins says was prejudicial. Finally, Watkins asserts that the sentencing court violated the Eighth Amendment by refusing to permit him to tell the jury that he would serve a minimum of twenty years without parole if sentenced to life imprisonment. Because we conclude that the district court was correct in denying the writ, we affirm.

I.

Shortly before 8:00 p.m. on May 26, 1988, Dr. Ralph McCauley went to the Allied Services store in a Danville, Virginia, shopping center because he was concerned that his son, who owned the store, had not returned from work that evening. When he arrived, Dr. McCauley saw his twenty-nine-year-old son, William McCauley, lying on the floor, face down in a pool of blood. William McCauley had been stabbed seven times in the upper back, and his throat had

2

been slashed three times. According to the medical examiner, four of these wounds were independently lethal. A trail of blood led from McCauley's body to the filing cabinet that served as a cash repository for the store. The cabinet was found empty, and the victim's wallet was also missing.

An employee of the store saw Ronald Watkins hanging around the store's entrance that same evening before the murder. She recognized Watkins because he had once worked at the store with her and William McCauley. Armed with this intelligence, the police questioned Watkins's girlfriend and siblings, who were persuaded to tape their phone conversations with Watkins. In one taped conversation with his brother, Watkins admitted to robbing William McCauley and then killing him because he knew Watkins. Shortly thereafter, after being arrested and given Miranda warnings, Watkins voluntarily confessed that he had stabbed McCauley and "cut his throat."

Prior to trial Watkins, who is black, challenged the venire because only five of its thirty-five members were black, while nearly thirty percent of the population of Danville is black. In the evidentiary hearing that followed, the judge noted that the venire was selected at random from voter registration lists by the clerk's office and that there is no Constitutional guarantee that a jury will have a racial make-up precisely proportional to that of the community at large. See J.A. 236-40. The trial court subsequently denied the challenge. At the pre-trial stage, Watkins did not raise any issue concerning historical or systematic racial discrimination in the seating of capital juries in Danville.

One of the members of the jury pool was Lennie Clark. On voir dire the prosecutor inquired whether Clark was related to Watkins. Clark replied that he was not related to Watkins but that he was related to a murder victim in an unrelated recent case. Defense counsel declined to challenge Clark for cause, despite Watkins's protests, and Clark was seated on the panel.

Watkins was convicted of capital murder and robbery on September 28, 1988. The penalty phase of the trial was conducted that same evening. Watkins offered Dr. Miller Ryans, a forensic psychiatrist, who testified that Watkins would not pose a threat of future dangerousness once incarcerated. In rebuttal the prosecution presented Dr.

Arthur Centor, a government forensic psychologist who had interviewed Watkins prior to trial. Dr. Centor's testimony tended to show that Watkins was a future danger to society even in prison. Defense counsel cross-examined Dr. Centor but did not object to his testimony.

Defense counsel argued at the close of the sentencing phase that while Watkins was violent and uncontrollable on the street, his ability to behave in an orderly manner while incarcerated merited a sentence less than death. The argument included the following statements:

> [T]here are two Ronalds, and I'm not saying that Ronald is schizophrenic or he has these emotional problems, but Ronald acts differently in different situations. The Ronald on the street is a monster. I can't deny that but the Ronald in the home where Dad is watching him and has rules and the Ronald in the penitentiary where the guards watch him and the guards have rules is a Ronald that can make it in this world, a Ronald that can live and a Ronald that does not deserve to die. Even the vilest person among us is still a human being and he's still blessed with the dignity and the God-given right to live that the Lord gave each and every one of us.

J.A. 347. The prosecutor, in his closing argument to the jury, accused Watkins of failing to show remorse for the killing:

> Remorse? What remorse has he shown? His own father said on May 31st he showed no remorse. Now he's scared and he should be, but has he shown any remorse in the courtroom? Did he show any remorse when his tape was being played about how he methodically killed Bill McCauley. He was over there jotting around. You heard his voice[on the tape] . . . Any remorse? Brutal.

J.A. 351. After considering the evidence and listening to these arguments, the jury recommended that Watkins receive the death penalty. The trial court thereafter sentenced Watkins to death.

After sentencing Watkins filed a "Motion and Memorandum to Prohibit Imposition of the Death Penalty on Grounds of its Arbitrary and Discriminatory Application in Violation of the Eighth and Fourteenth Amendments of the United States Constitution; Alternative Motion for Continuance and for Funds." J.A. 220. In this motion Watkins argued that the jury was racially biased due to unlawful exclusion of blacks from the jury pool. He based this argument on the grounds that there was only one black person on the jury (Lennie Clark) and that since 1980 capital juries in Danville had sentenced to death every black capital murder defendant accused of murdering a white victim. See J.A. at 223-24. These facts were developed in an evidentiary hearing involving testimony by several witnesses who had been involved in prior capital cases. See J.A. at 367-402 (excerpts). In the alternative, Watkins moved for a continuance and for funds to gather data on homicide cases tried in Danville over the past decade, although nothing in the record indicates that this alternative was pursued by Watkins. See J.A. at 225. After the hearing, the motion was denied.

On direct appeal Watkins argued that he was entitled to a jury matching the racial composition of the community. The Virginia Supreme Court rejected this argument, noting that Watkins "[made] no contention that the jury selection process was unlawful and makes no showing of any policy of, or effort toward, systematic exclusion" of blacks or "a history of under-representation of minorities on Danville juries." See Watkins v. Commonwealth , 385 S.E.2d 50, 53 (Va. 1989). Watkins contends that this was a mischaracterization of his claim, although the record does not show a petition for rehearing or any other effort to correct any misunderstanding.

The Supreme Court subsequently denied his petition for certiorari, with two Justices dissenting. See Watkins v. Virginia, 494 U.S. 1074 (1990). On March 20, 1991, Watkins sought a writ of habeas corpus in state court, which was denied on September 9, 1991. Thereafter, the Virginia Supreme Court and the United States Supreme Court refused petitions for appeal and certiorari, respectively, and a federal habeas petition was filed on April 15, 1994.

Watkins's application for the writ contained eighty-one claims. See J.A. at 151-58. Of these, only six have been pressed in this appeal.

5

The first claim asserts that there was racism in the selection of the jury for Watkins's trial, as well as for all juries in Danville capital trials involving black defendants. The next four claims allege ineffective assistance of counsel at trial and sentencing. The final claim concerns the state trial court's refusal to permit the jury to hear (as mitigating evidence at sentencing) that Watkins would have to serve twenty years of a life sentence before any possibility of parole. The district court rejected these claims, along with the others, on March 14, 1997. Watkins now appeals.

II.

A.

Watkins's initial ground for appeal concerns alleged racial discrimination in the formation of the jury that recommended his death sentence. His first argument is that the venire from which the jurors in his case were selected was chosen in a discriminatory manner violating the Sixth and Fourteenth Amendments, as evidenced by the relative lack of blacks. His second argument uses historical and empirical evidence in an attempt to demonstrate that his jury acted with discriminatory purpose in violation of the Equal Protection Clause. We take these arguments in turn.

1.

a.

The standard for a race-based challenge to the composition of a jury pool under the Sixth Amendment was set by the Supreme Court in Duren v. Missouri, 439 U.S. 357 (1979). To show a prima facie violation of the Constitution's fair cross-section requirement in selecting a jury pool:

> the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this

6

> underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Id. at 364. Only the third element is at issue here.

Watkins's Virginia Supreme Court brief indicates that his claim was based on the proposition that "reliance by the state on voter lists for venire, in light of the evidence of lack of registration by minorities, created a prima facie case" for a violation of the fair cross-section requirement of the Sixth Amendment. J.A. 26. The authority cited for this proposition was a California Supreme Court case setting aside a capital sentence on those grounds. See People v. Harris, 679 P.2d 433 (Cal. 1984).

Watkins's reliance on this California case was unsuccessful. The Virginia Supreme Court rejected the argument, stating that the use of the list of registered voters constitutes a fair selection system. See Watkins v. Commonwealth, 385 S.E.2d 50, 53 (Va. 1989) (citing Taylor v. Louisiana, 419 U.S. 522 (1975)). This is perfectly consonant with our consistent endorsement of the use of voter registration lists to develop jury pools. In United States v. Cecil, 836 F.2d 1431 (4th Cir. 1988) (en banc), we considered an attack on the jury selection procedure used by federal district courts in Maryland. We held that absent evidence of systematic exclusion of a class from the jury pool, the use of voter registration lists is entirely permissible. See id. at 1445-52. Similarly, we have upheld the use of current voter registration lists as a source for the jury pool in federal district courts in South Carolina because there was no affirmative discrimination in voter registration, even though minorities were underrepresented on the registration lists. See United States v. Lewis, 10 F.3d 1086, 1089-90 (4th Cir. 1993). We therefore agree with the Virginia Supreme Court that Watkins "[made] no showing of . . . systematic exclusion of members of his race" from the venire. Watkins, 385 S.E.2d at 53.[1]

_____

[1] Ultimately California itself rejected the argument made by Watkins, overruling Harris and holding that the use of voter registration lists was constitutionally compatible with Duren. See People v. Sanders, 797 P.2d 561 (Cal. 1990).

7

b.

Watkins also poses a Fourteenth Amendment challenge based on the same evidence, that is, the use of voter lists. A prima facie case of a Fourteenth Amendment violation in the composition of a venire must establish that "(1) there is a cognizable group, (2) that is substantially underrepresented by reason of (3) a selection procedure that is not racially neutral, i.e., is the result of intentional discrimination." United States v. Miller, 116 F.3d 641, 658 (2d Cir. 1997) (Kearse, J.) (citation omitted); see also Cunningham v. Zant , 928 F.2d 1006, 1013 (11th Cir. 1991) (citing Castaneda v. Partida , 430 U.S. 482, 494 (1977)).**2** Again, only the third element is at issue on this appeal.

In United States v. Biaggi, 909 F.2d 662 (2d Cir. 1990), the Second Circuit considered an equal protection challenge to the jury selection process in the Southern District of New York, which used voter registration lists as a source of names for the pool. The defendant in that case "made no claim that Blacks or Hispanics have been hindered in registering to vote." Id. at 677. As a result, the fact that fewer minorities actually register to vote, without more, did not deprive the jury selection plan of racial neutrality or render it susceptible to abuse, despite an almost one-third comparative disparity between the population and jury pool. See id.

In the present case, we also have a venire selected from voter registration lists. Watkins did not present any evidence to the Virginia state courts that the use of voter registration lists is"susceptible of abuse

_____

**2** It is not clear from the text of Castaneda whether the Court meant to institute a tripartite test for a prima facie case. See United States v. Biaggi, 909 F.2d 662, 677 (2d Cir. 1990) (expressing doubt whether Castaneda meant to require that selection procedure not be racially neutral in order to make prima facie case). We note, however, the near unanimity of our sister circuits in adopting a three-part test for an equal protection claim. See, e.g.,Miller, 116 F.3d at 658; United States v. Esquivel, 88 F.3d 722, 725 (9th Cir. 1996); James v. Whitely, 39 F.3d 607, 609 (5th Cir. 1994); Ramseur v. Beyer, 983 F.2d 1215, 1231 (3d Cir. 1992); Jefferson v. Morgan, 962 F.2d 1185, 1188 (6th Cir. 1992); Cunningham, 928 F.2d at 1019. For this reason, we also use the tripartite test.

or is not racially neutral." <u>Castaneda</u>, 430 U.S. at 494. Watkins therefore also failed to make a prima facie equal protection claim before the state court.

c.

Now Watkins wishes to present additional evidence that he alleges would support a finding of systematic discrimination and establish a prima facie case under both the Sixth and Fourteenth Amendments. This new evidence consists mainly of statistical data that purports to demonstrate a pattern of discriminatory sentencing of black capital defendants in Danville. <u>See</u> J.A. at 91-96. The district court declined to review this evidence because it was not presented to the state court during the two evidentiary hearings it held on the venire discrimination claim.

We have held that:

> [w]hen the state has given a petitioner a full and fair hearing on a claim and he has failed to develop the material facts supporting it, he is not entitled to develop further facts in a federal habeas evidentiary hearing unless he demonstrates either cause for the failure and prejudice resulting therefrom or a fundamental miscarriage of justice.

<u>Correll v. Thompson</u>, 63 F.3d 1279, 1288 (4th Cir. 1995) (citing <u>Keeney v. Tamayo-Reyes</u>, 504 U.S. 1, 8-12 (1992)). The requirement that full factual development of a claim take place in state court is dictated by comity in order to give state courts an opportunity to address the claim. <u>See Keeney</u>, 504 U.S. at 9-10 (citing <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971)).

Here, Watkins received not one, but two evidentiary hearings from the state trial court on the issue of racial discrimination in jury selection. <u>See</u> J.A. at 228-40; 367-402 (excerpts). None of the statistical evidence Watkins now proffers was presented to the Virginia courts, despite two opportunities to develop material facts supporting his discrimination claim. Watkins must therefore show either cause and prejudice or a fundamental miscarriage of justice in order to obtain a third evidentiary hearing on federal habeas review.

9

In order to show cause sufficient to satisfy Keeney, a petitioner must demonstrate "some objective factor external to the defense [that] impeded counsel's efforts" to present the evidence. Murray v. Carrier, 477 U.S. 478, 488 (1986). A reviewing court may only consider those sources of cause which are raised by the petitioner. See Correll, 63 F.3d at 1288. Here, Watkins only presents one possible ground for cause: that the trial court denied his motion for a continuance to gather data on Danville capital trials. This could constitute cause for a default.

In order to assert cause for failure to develop material facts at the state level, a petitioner must show that the basis of the cause is not procedurally barred. Cf. Pruett v. Thompson, 996 F.2d 1560, 1569-70 (4th Cir. 1993) (holding that if basis for alleged cause is barred, then cause itself is procedurally defaulted). Virginia law bars consideration of claims which could have been presented on direct appeal but were not. See Slayton v. Parrigan, 205 S.E.2d 680 (Va. 1974). We must apply the same standards of appellate default on habeas review as would apply under state law. See Smith v. Murray , 477 U.S. 527, 533 (1986) (barring claim not preserved on appeal to Virginia Supreme Court). No argument was made before the Virginia Supreme Court on direct appeal that the motion for a continuance was improperly denied. Therefore, Watkins is procedurally defaulted from citing that denial as cause on habeas review. Accordingly, Watkins cannot show cause justifying his failure to present his statistical evidence to the state courts.

Watkins also claims that he will suffer from a fundamental miscarriage of justice if he cannot present this evidence to a federal court. In Schlup v. Delo, 513 U.S. 298 (1995), the Supreme Court held that the fundamental miscarriage of justice exception applies only if the petitioner claims actual innocence of either the offense itself or of an aggravating circumstance that was the basis of a capital sentence. See id. at 321 ("[T]his Court explicitly tie[s] the miscarriage of justice exception to the petitioner's innocence"); Matthews v. Evatt, 105 F.3d 907, 916 (4th Cir. 1997). Nowhere in his brief to this court does Watkins claim actual innocence, nor does the record suggest that he is in fact innocent. We therefore agree with the district court's determination that Watkins's additional statistical evidence is procedurally

10

barred and that he has not established a prima facie case of racial discrimination in jury selection.

2.

Watkins's second claim is that race was an impermissible factor in his death sentence in violation of the Equal Protection Clause. He alleges that since 1980 all black defendants charged in Danville with capital murder of white victims received the death penalty. The evidence he cites includes an empirical study of capital cases in Danville, which Watkins developed before the state court through the testimony of persons involved in these prior cases.[3]

For over a decade the standard for reviewing allegations of racial discrimination in capital sentencing has been clear. A petitioner "must prove that the decisionmakers in his case acted with discriminatory purpose." McCleskey v. Kemp, 481 U.S. 279, 292 (1986) (emphasis in original). The Supreme Court places the burden on the petitioner to show discriminatory intent on the part of the jury in order to make a discrimination claim. In McCleskey the petitioner attempted to show discriminatory intent by presenting a detailed statistical analysis of the application of the death penalty in the state of Georgia. This evidence tended to show that blacks were more likely than whites to receive the death penalty. The Supreme Court found the study

_____

[3] On this issue Watkins proffers the same new statistical evidence that he proffered to support his claim of racial discrimination in selection of the jury pool. As noted above, Watkins cannot offer these new facts for the first time on federal collateral review, so we must decline to review that evidence here as well. See Correll, 63 F.3d at 1288.

Watkins also proffers historical evidence for the proposition that juries in Danville act with racist intent. Among the facts cited by Watkins was that Danville was the capital of the Confederacy in the waning days of the Civil War, that many black citizens were assaulted in an effort by the Democrat Party to defeat the Readjuster-Republican coalition in the 1883 election, and that civil rights activists suffered at the hands of local officials in the 1960s. This history cannot support a challenge to a 1988 jury: "unless historical evidence is reasonably contemporaneous with a challenged decision, it has little probative value." McCleskey v. Kemp, 481 U.S. 279, 298 n.20 (1987).

11

"clearly insufficient" to support an inference of discrimination by McCleskey's particular jury. Id. at 297. This conclusion followed from the principle, enunciated by the Supreme Court, that a statistical analysis is suspect in evaluating the death penalty because each jury is unique and each decision to impose the death penalty is based "on the circumstances of the individual defendant and facts of the particular capital offense." Id. at 294; cf. Fuller v. Georgia State Bd. of Pardons & Paroles, 851 F.2d 1307, 1310 (11th Cir. 1988) (distinguishing McCleskey in claim against Georgia Parole Board because statistics focused on the decisions of the Board, a single entity, rather than those of many unique juries).

The evidence that Watkins proffers suffers the same deficiency as that considered in McCleskey: it does not demonstrate that Watkins's particular jury acted with discriminatory intent. Indeed, if a comprehensive statistical study like that in McCleskey could not pass muster, we fail to see how the evidence presented by Watkins concerning just a handful of cases in Danville could satisfy the McCleskey standard. Accordingly, we follow the Supreme Court's holding in McCleskey and affirm the district court's denial of Watkins's claim.[4]

B.

Watkins also highlights four different instances where he claims trial counsel was ineffective. Watkins says that each instance by itself mandates relief. The first concerns the failure to challenge the seating of a juror who was related to a murder victim in another case. The second involves the failure to object in the sentencing phase to the testimony of a prosecution psychiatrist regarding Watkins's future dangerousness. The third involves a reference to Watkins as "a monster" and "vile" in closing argument to the sentencing jury. The fourth arises from a failure to object to the prosecutor's alleged comment on Watkins's silence at trial.

_____

[4] Watkins also claims prosecutorial misconduct based on race. Since this claim was not made to the Virginia state courts, we are barred from considering it here. See Gray v. Netherland, 116 S. Ct. 2074, 2080 (1996).

Almost fifteen years ago, the Supreme Court defined the burden for establishing ineffective assistance of counsel. A petitioner must show that counsel's performance was deficient, that it fell below an objective standard of reasonableness, and that the grossly deficient performance actually prejudiced the petitioner. See Strickland v. Washington, 466 U.S. 668, 686 (1984). The Court made it very clear that this is a highly deferential standard. Courts reviewing ineffective assistance claims must keep in mind the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. This deference reflects the fact that different counsel, all competent, may approach trial problems in different ways. A challenged action is ineffective assistance only if it cannot be considered sound trial strategy under the wide range of reasonable professional conduct. See id.; Arnold v. Evatt, 113 F.3d 1352, 1363 (4th Cir. 1997). With this standard in mind, we consider each instance where Watkins alleges ineffective assistance.

1.

Watkins's first such claim concerns the voir dire of Lennie Clark, a member of the jury pool who was ultimately selected for the panel that convicted and sentenced Watkins to death. At voir dire the prosecutor asked Clark about a rumor that he was related to Watkins. Clark answered that he was not aware of any relationship. Subsequent voir dire questioning cleared up the confusion by revealing that Clark was related to a murder victim in a totally different case. Defense counsel asked Clark no questions after learning this information, and counsel did not object for cause to Clark's seating on the jury. This strategy was directly contrary to Watkins's wishes.

Virginia law is clear that the mere fact that a juror is related to a victim in an unrelated case does not disqualify that juror. See, e.g., Mackall v. Commonwealth, 372 S.E.2d 759, 767 (Va. 1988) (mother of juror was recent rape victim). Any objection by Watkins's counsel on that ground would likely have been futile. Furthermore, the racial composition of the jury pool was already an issue in the case. Since Watkins's counsel apparently believed that black jurors were more favorably disposed to his client, it could have been a strategic decision on his part to permit Clark, who is black, to remain on the jury despite his connection to a victim in an earlier murder case. Accord-

13

ingly, we cannot conclude that defense counsel's failure to object to Clark's seating on the jury was not the result of competent trial strategy, so this first ineffective assistance claim must fail.

2.

At the sentencing proceeding, the defense presented Dr. Ryans, a forensic criminal psychiatrist who had evaluated Watkins in custody. Dr. Ryans testified that Watkins would not present a future danger to society within a penal institution, one of the primary arguments in the defense's case against the death penalty. In rebuttal the State called Dr. Centor, a forensic psychologist who had evaluated Watkins pursuant to court order on the Commonwealth's motion before trial. Dr. Centor used information gathered in that interview to rebut Dr. Ryans's testimony and assert that Watkins did present a risk of future dangerousness even while institutionalized. Watkins argues that Dr. Centor's testimony violated the holding of Estelle v. Smith, 451 U.S. 454 (1981), which held that a defendant has a Fifth and Sixth Amendment right to be notified that a psychiatric evaluation by the state may be used against him at sentencing.

The facts in this case are strikingly similar to those in Savino v. Murray, 82 F.3d 593 (4th Cir. 1996). In that case, the petitioner (Savino) was examined by a court-appointed expert in support of his mitigation claim. The Commonwealth of Virginia produced its own expert, coincidentally Dr. Centor, to perform a second evaluation. After Savino introduced his expert's testimony, the state rebutted with Dr. Centor's expert opinion that Savino would be a future danger to society. See id. at 604. On habeas review, we held that Dr. Centor's testimony did not violate the Fifth or Sixth Amendment because those rights were waived by Savino's request for a psychiatric evaluation and because Savino and his counsel had actual notice of the second interview. See id. at 604-05; see also Woomer v. Aiken, 856 F.2d 677, 681-82 (4th Cir. 1988) (holding that Constitution does not require specific notice that evaluation might provide basis for future dangerousness argument).

In the same way, Watkins and his counsel had actual notice of Dr. Centor's examination through the court's order before trial. See J.A. at 13. As a result, any objection to Dr. Centor's testimony on Fifth

14

and Sixth Amendment grounds would have been futile. Accordingly, we cannot conclude that defense counsel rendered ineffective assistance in not objecting to Dr. Centor's testimony.

3.

Watkins next complains about his counsel's closing argument in the penalty phase. Watkins claims that counsel was ineffective because he called Watkins "a monster" and"vile" in front of the jury. These characterizations, Watkins alleges, were so prejudicial to his effort to evade the death penalty that they constitute ineffective assistance. On its face, calling one's client a vile monster does not appear to be a wise tactical decision. Here, however, defense counsel's remarks are not nearly so shocking in context as Watkins suggests. It is evident from the tenor of the argument that counsel made a strategic decision to paint Watkins as a person who had considerable difficulty coping in an unstructured environment. The evidence strongly suggested that when subject to discipline, as in his father's home or in prison, Watkins controlled his violent tendencies and could be productive. Hence, "the Ronald on the street is a monster", J.A. 346 (emphasis added), but "the Ronald in the penitentiary . . . [is] a Ronald that can live and is a Ronald that does not deserve to die." J.A. 347 (emphasis added). This line of argument was a reasonable tactical move designed to try to avoid the death penalty.

Similarly, counsel appealed to the jury's compassion, reminding them in evocative language with religious overtones that "[t]he vilest among us is still a human being and he's still blessed with the dignity of the God-given right to live that the Lord gave each and every one of us." J.A. 347. Because counsel was attempting to convince the jury to spare the life of a man it had just convicted of a brutal murder, we cannot hold it deficient for counsel to appeal to the sympathy of the jury in attempting to spare his client. We must give counsel strategic leeway in such grave circumstances. Cf. Strickland, 466 U.S. at 689-90 (citing Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L. Rev. 299, 343 (1983)). Accordingly, we reject this claim as well.

4.

The prosecutor used his closing argument in the sentencing phase to urge that Watkins receive death for his crimes. He said that Wat-

15

kins did not show any remorse during trial or in the taped phone conversations. Watkins now alleges that defense counsel's failure to object to this statement by the prosecutor in effect permitted the prosecutor to get away with a comment on Watkins's silence in violation of the Fifth Amendment.

It is well-established that a prosecutor's remarks warrant reversal only if they infect a trial with unfairness to the point that the resulting conviction violates due process. See Darden v. Wainwright, 477 U.S. 168, 181 (1968). It is not a comment on the defendant's right to silence merely to assert that he lacks remorse. See Gaskins v. McKellar, 916 F.2d 941 (4th Cir. 1990).

A recent Eighth Circuit case is almost directly on point. In Six v. Delo, 94 F.3d 469 (8th Cir. 1996), the prosecutor made the following remarks at the close of the penalty phase:

> You've watched [Six] during this week, ladies and gentlemen, what remorse has he shown for the death of Kathy Allen? What remorse has he shown for cutting the throat of Stella Allen? What remorse has he shown for raping[Christine Allen]? What remorse has he shown? And now .. . they have the guts to come here and to ask you for mercy.. . . And you've already decided . . . whether or not he's guilty of the death. . . . What remorse has he shown?. . . . Let's talk now, folks, about courage and let's talk about cowardice. Because this man and his uncle are cowards. . . . And he sits before you today, a rapist, a killer, a thief and a coward -- and a coward.

Id. at 476. On habeas review, Six contended that his appellate counsel was ineffective for failing to raise a Fifth Amendment claim based on this passage. The Eighth Circuit found the prosecutor's statement to be unobjectionable. "Because the comments about remorse were prefaced by a reference to the jury's observance of Six during the trial, we cannot say the prosecutor's comments about remorse were intended as anything more than remarks on Six's general demeanor in the courtroom, or that the jury would view the comments as anything more." Id. at 477 (citing Gaskins).

16

In this case, the prosecutor clearly keyed his remarks about Watkins's lack of remorse to his demeanor in the courtroom and to his comments on the audio tape. Indeed, the comments made in Watkins's trial pale in comparison to the rhetoric found unobjectionable in <u>Six</u>. We do not believe that the jury would naturally have taken these comments as highlighting Watkins's failure to take the stand. As a result, it was not deficient for defense counsel to fail to object, so Watkins's final ineffective assistance claim also must fail.

C.

Watkins further argues that the state trial court violated the Eighth Amendment by refusing to permit the jury to hear evidence concerning the minimum length of imprisonment without parole he would face under a life sentence. Counsel moved in state court to be permitted "to discuss for the jury the parole eligibility [of the petitioner] so that they would know he would be in the penitentiary for a minimum of . . . twenty years" if given a life sentence. J.A. 320.[5]

The Eighth Amendment provides capital defendants with broad latitude to offer mitigating evidence at sentencing. The general rule is that the jury must consider "any aspect of a defendant's character or record or any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." <u>Lockett v. Ohio</u>, 438 U.S. 586, 604 (1978) (plurality opinion). A jury can sentence a person to death in accordance with the Eighth Amendment only after it considers all of the mitigating evidence the defendant wishes to present. <u>See id.</u> at 608; <u>Hitchcock v. Dugger</u>, 481 U.S. 393 (1987) (holding for a unanimous Court that sentencing in a capital case must consider an extensive list of non-statutory mitigating factors, including defendant's good deeds as an affectionate uncle and childhood habit of inhaling gas fumes).

_____

[5] The Commonwealth disputed this calculation at trial and continues to do so here. Watkins also revised his estimation of the minimum sentence in his habeas petition, upwards to thirty years. There is not sufficient information in the record to resolve this difference. In any event, the difference is not material to our decision.

17

Despite this broad interpretation of mitigating evidence under the Eighth Amendment, before 1994 Virginia refused to permit juries to hear evidence about parole eligibility in sentencing proceedings. See, e.g., Poyner v. Commonwealth, 329 S.E.2d 815, 836-37 (Va. 1985) (holding that sentencing jury should not be informed of parole eligibility in the event of life sentence); cf. Peterson v. Murray, 904 F.2d 882, 886-87 (4th Cir. 1990) (holding that Eighth Amendment does not require that sentencing jury be told defendant will not be eligible for parole for twenty years if given life sentence). These cases relied on California v. Ramos, 463 U.S. 992 (1983), which held that the state had discretion to determine whether to inform a sentencing jury about the possibility of parole. In 1994 the Supreme Court broke with this precedent and held that refusing to permit a jury to hear that a life sentence carried no possibility of parole violated due process. See Simmons v. South Carolina, 512 U.S. 154 (1994). Two Justices also concluded that the Eighth Amendment requires such information be given to the jury. See id. at 172 (Souter, J., concurring). Applying Simmons to this case, Watkins alleges, would mandate award of the writ under the Eighth Amendment.

However, "before a state prisoner may upset his state conviction or sentence on federal collateral review, he must demonstrate as a threshold matter that the court-made rule of which he seeks the benefit is not `new.'" O'Dell v. Netherland , 117 S. Ct. 1969, 1973 (1997). A "new rule" is one which was not "dictated by precedent existing at the time the defendant's conviction became final." Teague v. Lane, 489 U.S. 288, 301 (1989). A state conviction will only be overturned if the state court, at the time the conviction became final, "would have acted objectively unreasonably by not extending the relief later sought in federal court," O'Dell, 117 S. Ct. at 1973, or if "fundamental fairness" would dictate application of the rule. See id. at 1978 (citing Gideon v. Wainwright, 372 U.S. 335 (1963), as such a rule). Our inquiry therefore focuses on whether the rule advocated by Watkins was dictated by precedent in 1988.

In O'Dell the petitioner (O'Dell) had been convicted in a Virginia court in 1988 for rape and murder. At the sentencing phase O'Dell unsuccessfully sought a jury instruction that he would be ineligible for parole if he received a life sentence. See id. at 1972. He then applied for federal habeas relief, arguing that Simmons required that

18

his jury hear about his parole ineligibility. The Supreme Court rejected this argument, holding that <u>Simmons</u> was a "new rule" and that a federal court was barred by <u>Teague</u> from applying it on habeas review to a 1988 Virginia conviction. <u>See id.</u> at 1977 ("[W]e think it plain that, a reasonable jurist in 1988 would not have felt compelled to adopt the rule later set out in <u>Simmons</u>."). The Court also declined to place <u>Simmons</u> within the "fundamental fairness" exception of <u>Teague</u>. <u>See id.</u> at 1978. Given the Supreme Court's clear command, we are compelled to recognize that <u>Simmons</u> does not apply to a 1988 conviction and sentence.

Watkins argues that under the rule in <u>Simmons</u> the Due Process Clause now requires that juries be informed of the precise meaning of "life imprisonment" as an alternative to death, including mandatory minimum sentences without parole. <u>See Brown v. Texas</u>, 118 S. Ct. 355, 356 (1997) (Stevens, J., respecting denial of certiorari) (noting that denial of certiorari on issue should not be interpreted as rejecting the principle that information on mandatory minimum sentence should be presented to jury). Furthermore, Watkins argues that the <u>Simmons</u> rule may derive from the Eighth Amendment as well as the Due Process Clause. <u>See Simmons</u>, 512 U.S. at 172 (Souter, J., concurring); <u>but see id.</u> at 162 n.4 (reserving Eighth Amendment question); <u>id.</u> at 174 (Ginsburg, J., concurring) (narrowly construing holding to Due Process aspects). Watkins's argument regarding mandatory minimums, which would apply the rule of <u>Simmons</u> through the Eighth Amendment, must fail under <u>Teague</u>. Such a rule could not apply to Watkins's 1988 sentence. <u>Cf. O'Dell</u>, 117 S. Ct. at 1977. His attempt to obtain habeas relief to permit a jury to hear about his mandatory minimum sentence is thus foreclosed.

III.

Watkins's application for the writ of habeas corpus was properly dismissed by the district court, and the judgment of that court is accordingly

<u>AFFIRMED</u>.

19